UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

CARRIE SCHEUFELE, JEFFREY        :
SCHEUFELE and NICHOLAS ORAM,     :
Individually and on Behalf of All Others   :
Similarly Situated,                  :
                              :
             Plaintiffs,     :
                              :
     vs.                      :
                              :
TABLEAU SOFTWARE, INC., CHRISTIAN   :
CHABOT, THOMAS WALKER, PATRICK   :
HANRAHAN and CHRISTOPHER STOLTE, :
                              :
             Defendants.    :
                              :

——————————————————— x

Civil Action No. 1:17-cv-05753-JGK

<u>CLASS ACTION</u>

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

<u>JURY TRIAL DEMANDED</u>

Lead Plaintiff Plumbers and Pipefitters National Pension Fund ("Lead Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations based upon the investigation of Lead Plaintiff's counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Tableau Software, Inc. ("Tableau" or the "Company"), interviews with former Tableau employees and persons knowledgeable about the Company's business, as well as reports by securities analysts, press releases, media reports and other public statements issued by or about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Tableau Class A common stock ("common stock" or "common shares") (the "Class") between February 5, 2015 and February 4, 2016, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

4.      Venue is proper in this District under Section 27(a) of the Exchange Act, 15 U.S.C. §78aa(a), and 28 U.S.C. §1391(b)-(d).  Many of the acts and transactions that constitute the alleged violations of law occurred in this District.  In connection with the acts and transactions alleged in this Complaint, Defendants (defined herein), directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mail, interstate telephone and other electronic communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange, located in this District.

## PARTIES

5.      Lead Plaintiff Plumbers and Pipefitters National Pension Fund is a multi-employer defined benefit plan established by the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry and various employers.  As set forth in its certification previously filed with this Court and incorporated by reference herein, Lead Plaintiff purchased Tableau common stock during the Class Period and suffered damages thereby.

6.      Defendant Tableau is a software company that markets and licenses software that simplifies the process of accessing and visualizing large, complex data sets.  On May 23, 2013, the Company completed its initial public offering and its shares are traded on the NYSE under the ticker symbol "DATA."  Tableau has two classes of authorized common stock, Class A and B.  Except for voting and conversion rights, the rights of the holders of each class of stock are identical: each share of Class A common stock is entitled to one vote per share, while each share of Class B common stock is entitled to ten votes per share and is convertible into one share of Class A common stock. As detailed below, Defendant Tableau, through the Individual Defendants (defined below) and other senior executives, made materially false and misleading statements during the Class Period.

7.      Defendant Christian Chabot ("Chabot"), a co-founder of Tableau, served, at all relevant times, as the Company's Chief Executive Officer ("CEO") and Chairman of its Board of

Directors (the "Board").  As detailed below, Defendant Chabot made materially false and misleading statements during the Class Period.

8.      Defendant Thomas E. Walker, Jr. ("Walker") served, at all relevant times, as Tableau's Chief Financial Officer ("CFO").  As detailed below, Defendant Walker made materially false and misleading statements during the Class Period.

9.      Defendant Patrick Hanrahan ("Hanrahan"), a co-founder of Tableau, served, at all relevant times, as Tableau's Chief Scientist and a Director of the Board.  Defendant Hanrahan signed the 2014 Form 10-K (defined below), which contained materially false and misleading statements, as alleged herein.

10.     Defendant Christopher Stolte ("Stolte"), a co-founder of Tableau, served, at all relevant times, as Tableau's Chief Development Officer.  Defendant Stolte signed the 2014 Form 10-K (defined below), which contained false and misleading statements, as alleged herein.

11.     Unless otherwise noted, Defendants Chabot, Walker, Hanrahan and Stolte are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants and Tableau are collectively referred to herein as "Defendants."

12.     Due to the Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about Tableau's business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* internal corporate documents (including operating plans, budgets and forecasts, and reports of actual operations compared thereto).  In addition, the Individual Defendants were made aware of undisclosed information about the Company from conversations and communications with other corporate officers and employees, as well as attendance at management and/or Board meetings and committees.

- 3 -

13.     It is appropriate to treat Defendants as a group for pleading purposes and to presume that the alleged false, misleading and incomplete information conveyed in the Company's public filings, press releases and other statements herein are the collective actions of the narrowly defined group of Defendants identified above.  The Individual Defendants were directly involved in the management and day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, competition, financial statements, and financial condition, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, competition, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants also participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, as well as other communications

complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the disclosure in various SEC filings, press releases, as well as public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with information alleged herein to be misleading before or shortly after its issuance and/or had the ability and/or opportunity to prevent its issuance or cause it to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the misrepresentations contained therein.

17.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Tableau common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (a) deceived the investing public regarding Tableau's financial performance, business, prospects and operations, as well as the intrinsic value of Tableau's common stock; (b) enabled the Individual Defendants to sell approximately *$335 million* worth of their Tableau common stock to the unsuspecting public at artificially inflated prices; and (c) caused Lead Plaintiff and the Class to purchase Tableau publicly-traded common stock at artificially inflated prices.

## BASIS OF ALLEGATIONS

18.     The factual allegations herein, as well as the inferences arising from these allegations are corroborated by information obtained by former Tableau employees ("FE"s) with knowledge of its business and operations.  The following chart sets forth the positions and tenure of these individuals:

| FE # | Job Description | Tenure |
|------|----------------|--------|
| 1 | Senior Sales Manager | January 2011 – January 2016 |
| 2 | Senior Sales Area Manager | January 2014 – April 2017 |
| 3 | Senior Vice President of the Americas | May 2013 – January 2016 |
| 4 | Enterprise Account Manager | August 2014 – December 2015 |
| 5 | Sales | September 2014 thru end of Class Period |
| 6 | Senior Commercial Sales Manager | March 2014 – November 2016 |
| 7 | Commercial Sales Manager | October 2012 – December 2016 |

19.     FE-1 was employed at Tableau as a Senior Sales manager between January 2011 and January 2016.

20.     FE-2 was employed at Tableau between January 2014 and April 2017 in various marketing/sales capacities, the most recent of which was as Senior Sales Area Manager.

21.     FE-3 was employed at Tableau from May 2013 through January 2016 as a Senior Vice President of the Americas.

22.     FE-4 was employed at Tableau from August 2014 through December 2015 as an Enterprise Account Manager.

23.     FE-5 was employed at Tableau from September 2014 until after the Class Period in a sales role.

24.     FE-6 was employed at Tableau from March 2014 to November 2016 as a Senior Commercial Sales Manager.

25.     FE-7 was employed at Tableau from October 2012 to December 2016 in various sale capacities, the most recent of which was as a Commercial Sales Manager.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Operations

26.     Tableau's roots trace back to the computer science department at Stanford University where Tableau co-founder, and Professor, Defendant Hanrahan, began working on a U.S.

- 6 -

Department of Defense DARPA[1]-funded project that was designed to analyze data using computer graphics.  There, Defendant Hanrahan teamed up with Stanford Ph.D. candidate and Tableau co-founder, Defendant Stolte, to invent a technology called VizQL (Visual Query Language), which graphically expresses information within a database.  Defendant Chabot, a Stanford Business School MBA, later joined Defendants Hanrahan and Stolte to use this technology to found Tableau in 2003.

27.     Now a business analytics software company which produces interactive data visualization products focused on business intelligence, Tableau has developed five key products: (1) Tableau Desktop, a self-service, analytics product for use by anyone with data; (2) Tableau Server, a business intelligence platform for use by organizations; (3) Tableau Online, a cloud-based software-as-a-service ("SaaS") version of Tableau Server; (4) Tableau Public, a free cloud-based platform for analyzing and sharing public data; and (5) Vizable, a free application used to analyze data on a tablet.

28.     The Company has two primary sources of revenue: license revenue, which, during the Class Period, accounted for approximately two-thirds of Tableau's total revenue; and maintenance and service revenue, which accounted for the balance of Tableau's Class Period revenue.  Approximately 75% of the Company's total revenue during the Class Period were derived from customers located in the United States and Canada.

29.     The generation of license revenue is critically important to Tableau's profitability, not only because it accounted for approximately two-thirds of its total business during the Class Period, but also because it generated a gross profit margin of approximately 100% during the Class Period (as compared to a lower 70% gross profit margin derived from maintenance and service revenue during the Class Period).  Additionally, Tableau's customers typically enter into multiple-element

---

[1]     DARPA is an acronym for the Defense Advanced Research Projects Agency, an agency of the United States Department of Defense.

arrangements that include maintenance services, as well as professional services and training.  Thus, the Company's maintenance and service revenue is largely dependent upon the sale of software licenses.

30.     Tableau utilizes click-through license agreements, signed agreements and purchase orders as evidence of an arrangement.  An open purchase order represents an authorization to purchase and is not considered an actual binding agreement.  Once a purchase is completed, the Company delivers its software electronically by providing its customers access to the software and a license key *via* a secure portal.

31.     Tableau's license revenue, which is derived from the sale of licenses to new customers and incremental licenses to existing customers, includes perpetual, term, and subscription license fees.  Fees from perpetual licenses accounted for more than 90% of the Company's license revenues during the Class Period.

**Defendants Concealed the True Competitive Threats
to Tableau's Business While Dumping Over $335,000,000
of Their Personally-Held Stock on the Unsuspecting Public**

32.     In the years prior to the beginning of the Class Period, Tableau capitalized on the burgeoning business analytics market by developing easy-to-use software products that enabled laypeople to make querying, analyzing and visualizing data a relatively easy task.  As a result, Tableau experienced rapid software adoption, enjoyed little competition and benefited from superior pricing power.

33.     By no later than the start of the Class Period, however, Defendants knew that large technology companies with significant financial, technical, marketing capabilities – including Amazon.com, Inc. ("Amazon"), International Business Machines Corporation ("IBM"), Microsoft Corporation ("Microsoft"), Qlik Technologies Inc. ("Qlik"), Salesforce.com, Inc. ("Salesforce"), SAP SE ("SAP"), MicroStrategy, Inc. ("MicroStrategy") and Tibco Software Inc. ("TIBCO") – had

- 8 -

introduced, or were set to introduce, aggressively-priced software products that directly competed with Tableau's products and which were causing Tableau's customers to delay and, later cancel, pending license orders.

34.     For example, on September 17, 2014, Qlik announced the general availability of its product, Sense, billed as the "the first device-independent, self-service visualization and discovery product engineered for enterprise-class governance and performance."

35.     On October 13, 2014, Salesforce introduced its product, Wave, which was billed as the "first cloud analytics platform designed for every business user, making it easier than ever for anyone to explore data, uncover new insights and take action instantly from any device."

36.     On November 21, 2014, IBM released its product Cognos Business Intelligence. Cognos Business Intelligence contained features meant to enhance the end user experience and ease of use by simplifying functionality, allow for quicker, easier deployments leading to faster time to value, and improve general data access and administrative functions to make management of the tool more efficient.

37.     In July 2013, Microsoft released a preview version of its Power BI software that was meant to provide users with the ability to construct color-coded 3D mapping, and region-based visualization tools that color-code geo-political areas including ZIP codes, counties, states, countries, and regions.  It also allowed for natural language queries.  Power BI was released to the general public on July 24, 2015, and offered "a free-form canvas for drag-and-drop exploration of your data and an extensive library of interactive visualizations, while streamlining report creation and publishing to the Power BI service."

38.     On October 7, 2015, Amazon released its product Quicksight, which Amazon publicized as a "very fast, easy to use business intelligence for your big data needs at 1/10th the cost of traditional on-premises solutions."

39.     As a result, by the start of the Class Period, Defendants knew or recklessly disregarded that the Company's historical rate of growth was unsustainable and would soon decline as competitors seized market share and competition lowered prices.

40.     Nonetheless, throughout the Class Period, Defendants repeatedly reassured investors that competitive threats had not changed even though they knew that low-priced, competitive software offerings were then causing customers to delay pending licensing arrangements.  According to Tableau FEs, during the Class Period, sales personnel were unable to meet established quotas when license deals slowed due to lower priced bids by the Company's competitors.  As more and more Tableau customers adopted a wait-and-see approach, sales cycles lengthened and the growth rate of Tableau's licensing revenue during the Class Period decelerated significantly:



41.     Understanding that Tableau's historic rate of growth was unsustainable as customers delayed purchases and canceled pending orders, Defendants repeatedly misled investors about the

true scope and extent of Tableau's competitive landscape, claiming competition was having little, if any, impact on the Company's business and its business outlook.

42.     At the same time that Defendants were telling investors that they hadn't "seen a change in the competitive landscape," among other things, Tableau insiders were selling substantial portions of their holdings, dumping hundreds of millions of dollars of their personally-held Tableau common stock on the unsuspecting public.

43.     By no later than the start of the Class Period, Tableau was experiencing increased competition and its sales cycle had lengthened.  Tableau monitored its sales through a system internally referred to as "Alpo."  Every Tableau employee had access to Alpo and this sales data was also presented and shown at sales meetings.

44.     According to FE-1, increased competition delayed even "slam dunk" license deals and sales cycles lengthened as it became more difficult for Tableau to close license transactions.  FE-1 explained that 2011, 2012, and 2013 were great years, but that 2014 and 2015 were plagued with salespeople not hitting their quarterly sales goals, which eventually caused Tableau to lower its sales quotas in January 2016.

45.     FE-1 also stated that the problems associated with sales people not meeting their 2015 sales targets were "well-known" within the Company, as Tableau used software to monitor performance by sales personnel.  The software allows the administrator for each report to see which Tableau employees viewed it.  According to FE-1, *every Tableau employee*, including the Company's executives, could access the Company's sales data, which was also presented and shown at sales meetings that were routinely attended by Tableau's Chief Marketing Officer Elissa Fink and occasionally attended by Defendants Walker and Chabot.  FE-1 recalled Defendant Chabot attending a sales meeting and addressing the issue of people missing sales targets.

46.     FE-1 further stated that Kelly Wright, Executive Vice President of Sales, was always at the sales meetings doing her "rah-rah" speeches even once it was clear that Tableau's sales expectations were plummeting.  FE-1 believed that Wright, in particular, would view the sales dashboards at least daily.

47.     According to FE-2, many deals were lost to Microsoft, noting that they always "threw a wrench in our plans," as well as other competitors that were emerging.  Similar to FE-1, FE-2 stated the effects of competition, which caused Tableau's sales cycle to lengthen, were closely monitored by the Company's management, which utilized dashboards and "competitive analysis," to detail business that had been lost to competition.

48.     FE-3 commented that Tableau's growth slowed because of new, low-priced competitive product offerings, including those by Microsoft and Amazon.

49.     FE-3 also explained that there was a "huge price gap" between Tableau and its competitors which encouraged customers to either delay purchasing the Company's software or buy from its competitors.  FE-3 noted it was clear that Tableau was experiencing a "more competitive environment" because sales cycles had become elongated in mid-2015.

50.     FE-3 stated that Tableau closely tracked license deals, the companies that Tableau competed against, as well as customer wins and losses.  FE-3 also noted that he was a member of the CEO's Executive Leadership Team which held meetings "every couple of weeks" to discuss, among other things, Tableau's competition.  FE-3 stated that management was knowledgeable of increased competition in the marketplace; however, the prevailing attitude of management was one of "arrogance."

51.     Likewise, FE-4 recalled that competition from the larger competitors, including Microsoft, caused longer sales cycles by the latter part of 2014.

52.     FE-5 noted that by early 2015, it became very difficult to close license deals due, in part, to the anticipated release of a competitive product, Power BI, by Microsoft.

53.     In addition, FE-6 stated that by no later than the end of the first quarter of 2015, "everybody" within the Company understood that competition was having a meaningful impact on Tableau's business.  FE-6 also confirmed that all hands sales meetings were held once a quarter and were attended by Company executives, including, at times, Defendant Walker, or other VPs of Finance, the Chief Strategy Officer or the Chief Product Officer.

54.     FE-7 stated that by late 2014 it was clear that there was significant competition on the horizon.  According to FE-7, Tableau experienced a "disruption" in its business as customers became more aware of competition.  For example, FE-7 explained that, since many of Tableau's potential customers already had the Microsoft suite of products, it became more difficult to sell Tableau licenses when Microsoft released its BI software.

55.     FE-7 also noted that the sales cycle for proactive enterprise customers was generally between three to four months and ranged between six to nine months for other customers. According to FE-7, the customer sales cycles became "drawn out" and elongated sales cycles during 2015.

56.     In sum, by the start of the Class Period, Defendants knew that Tableau faced an extremely competitive market for its products, that its sales cycle was lengthening and it was losing deals to lower priced competitors' offerings.  The following chart depicts the Class Period price movements in Tableau stock, important statements and Defendants' insider trading:



**Tableau's Class Period SEC Filings Did Not Comply
with SEC Disclosure Regulations**

57.     Item 7 of Form 10-K and Item 2 of Form 10-Q requires SEC registrants to furnish the

information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's*

*Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").  Among

other things, Item 303 of Regulation S-K required that Tableau's Class Period Forms 10-K and 10-Q

disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact

on its revenues or income from continuing operations.

58.     In 1989, the SEC issued interpretative guidance associated with the requirements of

Item 303 of Regulation S-K concerning the disclosure of material trends or uncertainties.  In

particular, the interpretative guidance states specifically that when an SEC registrant knows that a

- 14 -

competitor has introduced to the marketplace a product similar to its own at a price less than that charged by the registrant, a known uncertainty that is reasonably likely to have a material effect on its future operating results exists, and disclosure is required.  The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> \*          \*          \*
>
> **Events that have already occurred** or are anticipated **often give rise to known uncertainties**.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, **the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant**, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  **In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required**.[2]

59.     In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303.  Such guidance states, in pertinent part:

> **We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication**.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

60.     Thus, the MD&A disclosures in Tableau's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and trends associated with competitive offerings then known to

---

[2]     Unless otherwise noted, all emphasis is added and internal citations are omitted.

management that were reasonably likely to have a material effect on the Company's future operating results.

61.     In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], *Risk Factors*.  Item 503 of Regulation S-K required that Tableau's Class Period Forms 10-K and 10-Q disclose the most significant matters that make an investment in Tableau risky.

62.     As detailed herein, during the Class Period, Tableau's Forms 10-K and 10-Q made materially false and misleading representations about ***potential*** competitive risks when, in fact, such risks were then ***existing***.

63.     Further, Item 9A of Form 10-K and Item 4 of Form 10-Q requires SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures*.  Item 307 of Regulation S-K required Tableau's Class Period Forms 10-K and 10-Q to disclose Defendant Chabot's and Defendant Walker's conclusions about the effectiveness of Tableau's disclosure controls, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

64.     During the Class Period, Tableau falsely and misleadingly represented in the Forms 10-K and 10-Q it filed with SEC that its disclosure controls were operating effectively when they were not, as detailed herein.  These false and misleading representations were then fraudulently certified by Defendants Chabot and Walker, as set forth herein.

### Materially False and Misleading Statements Made During the Class Period

65.     The Class Period begins on February 5, 2015.  On February 4, 2015, after the close of trading, Tableau issued a press release announcing its financial results for the 2014 fourth quarter

and fiscal year end, the periods ended December 31, 2014.  For the fourth quarter, Tableau reported total revenue was $142.9 million (representing a 75% increase from the fourth quarter of 2013) and license revenue of $101.4 million (representing a 75% increase from the fourth quarter of 2013).  For the year ended 2014, Tableau reported total revenue of $412.6 million (representing a 78% increase from 2013) and license revenue of $279.9 million (representing a 75% increase from 2013).  Defendant Chabot, commenting on the results, stated, in pertinent part, as follows:

> Tableau's quarterly and fiscal 2014 results were excellent.  I'm proud to say that our investments in people, product and customers paid off in 2014 with record revenue, strong customer adoption and accelerated growth in our enterprise business.  In 2014, we experienced the strongest demand we've seen in our history, as the move to agile analytics grows faster than ever.

66.     Later that day, Tableau held a conference call with analysts and investors to discuss the Company's earnings release and business.  During the Q&A session of the conference call, Defendants were asked about the sustainability of Tableau's larger-scale deployments.  In response, Defendant Chabot falsely and misleadingly stated that "I don't personally forecast any decline in that trend."  The following exchange, in pertinent part, took place:

Brent Bracelin - Pacific Crest Securities, Analyst:

I guess, my question is really around the sustainability of these larger-scale deployments.  As you look out into 2015, is there a pattern that you're seeing developing that's repeatable?  Any color, as you think about other examples like VMware, where you're seeing larger-scale deployments of the technology would be helpful.

Defendant Chabot:

Yes.  **I would [say] that the trend is towards larger and larger deployments of Tableau**.  I mean, you can see it in some of the simple numbers.  For example, the large transaction number we've been releasing was 781, which was huge growth over the previous year.  And those are deals greater than $100,000.  And those are becoming very significant.  They're indicative of companies moving their entire business analytics strategy to the Tableau way of doing things.

And I'm just pausing to reflect for a second; **I would go so far as to call it a pattern**.  Four years ago, it was a relatively obscure thing to take one of these new,

- 17 -

agile, self-service alternatives and go make it your enterprise, go-to BI standard.  It was rare, indeed.  These days, it's commonplace.  Sometimes that means it's still a divisional victory or in a couple of divisions.  Other times, it is the go-to analytics and reporting platform going all the way up to the CEO and occupying their most important data-driven initiatives.

**I don't personally forecast any decline in that trend.  In fact, I think our best years are ahead of us**.

67.     The statements referenced above in ¶66, that "the trend is towards larger and larger deployments of Tableau" and that Chabot did not "personally forecast any decline" in the large scale deployment trend, were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; and (c) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

68.     When asked about the impact of Microsoft's then recent new product offering announcement and its significant price reduction, Defendant Chabot deceptively reassured the marketplace that it would have no meaningful impact on Tableau, calling it more of the same in a long history of similar product offerings by competitors, stating in, pertinent part, as follows:

Microsoft is a fierce and respected competitor, and we would certainly expect that they will be in the market for many years.  This recent move is the latest in a long history of – look, we have something for free moves.

**None of those moves, historically, have had an impact on the competitive structure and dynamics in our industry.  And as such, we don't believe this one will, as well, particularly because it does not come in combination with what we view as any profound product change**.

69.     The statements referenced above in ¶68, that "[n]one of [Tableau's competitors'] moves, historically, have had an impact on the competitive structure and dynamics in our industry,"

and that Microsoft's product offering did not provide competition because it did not "come in combination with what we view as any profound product change," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

70.     When asked about competition from Salesforce's Wave product, and other moves by competitors to more subscription-based products, Defendant Chabot falsely proclaimed that Tableau's competitors' products presented no meaningful threat, stating, in pertinent part, as follows:

> On the first part of the question, **we haven't seen any fundamental competitive change on the Salesforce Wave front**. That product, I would classify as a nice reporting upgrade for Salesforce data. It isn't particularly analytically rich. Obviously, there's no [permit] story. There isn't a sophisticated big data component, and so on, down the line. I think it's a good product, as far as I can tell. **But it, in no way, has entered our pipeline as a fundamental competitive threat at this point**. **But we'll continue to monitor it**.

> With regard to business model changes at TIBCO, I'm not an expert on that, that's a better question for them. **I can report, again, on that front in particular. We haven't seen any shift in the competitive dynamic in the last six months**.

71.     The statements referenced above in ¶70, that Tableau had not "seen any fundamental competitive change on the Salesforce Wave front," that Wave "in no way, has entered our pipeline as a fundamental competitive threat," and that Tableau had not "seen any shift in the competitive dynamic in the last six months," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or

recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

72.     On February 10, 2015, Tableau participated in Goldman Sachs' Technology & Internet Conference.   During the conference, Defendant Walker minimized the existence of meaningful competition.   The following exchange, in pertinent part, took place:

Greg Dunham - Goldman Sachs & Co., Analyst:

And one of the things **we've seen with the success that you've had**, in terms of growth rates in the 70%s, even off of bigger, bigger numbers, **an awareness amongst people in the industry** that this is – that you have been successful.

**It feels like there's more announcements from some of the legacy guys that they're going to get more aggressive in the market.  Microsoft has announced that they've got Power BI and they're going to cut pricing.  And Qlik has a new product, Sense, out there**.

**Talk about the competitive landscape today**.  Have you seen –?  Clearly, Q4 doesn't show like that's impacted you.  Why not?  And what do you think the biggest challenge is for the Microsofts, the MicroStrategys, the IBMs of the world?

Defendant Walker:

I'll leave it to them to see what their challenges are around what they want to do. But overall, the products you've just mentioned, they're relatively new.  The Qlik product or the Microsoft change, that's all relatively new.  So, we haven't seen a lot with that.

**I wouldn't think that the overall landscape of competition has changed drastically over the last two years that we've been public**.  The interesting thing about us is that the market opportunity as we see it, we don't see it as just the traditional BI market opportunity.  We do think about Excel or Power users, knowledge workers.

- 20 -

And it's not a rip and replace on Excel at all, because I think we're extremely complementary to Excel and Access and SQL server and [MSAS] and all that. So, those are all data sources to us that we connect to. So, we're very complementary to people who have to have analytics using those.

But then, there's this greenfield space, which is people who don't know what BI is, have no idea what it stands for, aren't really into analytics, but they have some data and they have questions and they really do want to better themselves.

And so, in any given period, in any quarter, we're selling to all three of those buckets, and we're addressing that market, which is a lot different than the competitors are. A lot of the competition had to do with the traditional BI because it was the more established market. But we think about the other 80% of the organization that has needs around analytics, that are being disenfranchised. And so, we're trying to go after both, all the time.

**So, that's why I say the dynamic hasn't changed too much, but we're always vigilant around that**. We're small in relative size to one of those companies you mentioned. And so, we continue to do that.

73.     The statements referenced above in ¶72, that "I wouldn't think that the overall landscape of competition has changed drastically over the last two years that we've been public" and that the competitive "dynamic hasn't changed too much," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

74.     On February 27, 2015, Tableau filed with the SEC its Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K"), signed by the Individual Defendants. The 2014 Form

10-K contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as Defendants Chabot's and Walker's certifications thereon.

75.     The risk factor disclosure included in the 2014 Form 10-K deceptively referred to **_potential risks_** associated with generating incremental license revenue from existing customers, when, in fact, such risks were **_then existing_**, stating, in pertinent part, as follows:

> Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations.
>
> *        *        *
>
> **If** our customers do not purchase additional licenses or capabilities, our revenues **may grow more slowly than expected**, may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management.  There can be no assurance that our efforts would result in increased sales to existing customers, or upsells, and additional revenues.  **If** our efforts to upsell to our customers are not successful, our business would suffer.
>
> *        *        *
>
> **If** our sales cycle were to lengthen . . . events **may** occur during this period that affect the size or timing of a purchase or even cause cancellations, which **may** lead to greater unpredictability in our business and results of operations.

76.     In addition, the MD&A disclosure included in the 2014 Form 10-K was materially false and misleading in that it failed to disclose the effects of then known events and uncertainties, that were then having, and were reasonably likely to continue to have, a material effect on the Company's operating results, including those events and uncertainties associated with the introduction of software products similar to those of Tableau by large, well-established companies at prices substantially lower than those charged by the Company.

77.     The 2014 Form 10-K also contained false and misleading representations about Tableau's disclosure controls being effective, when in reality they were poorly designed and "ineffective" in assessing the risk of material misstatements, stating, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

**Under the supervision and with the participation of our principal executive officer and principal financial officer**, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of December 31, 2014, the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, **our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures** are designed to, and **are effective** to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

78.     The representations in the 2014 Form 10-K about Tableau's disclosure controls being effective were then falsely and misleadingly certified by Defendants Chabot and Walker:

I, [Defendant Chabot and Defendant Walker], certify that:

1.     I have reviewed this Annual Report on Form 10-K of Tableau Software, Inc.;

2.     **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules13a-15(e) and 15d-15(e)) and internal control over financial

reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.    **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant,** including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.    **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation**; and

    d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

79.    The material misstatements and omissions included in the 2014 Form 10-K failed to disclose material facts required by SEC rules and regulations associated with the adverse effects on Tableau's operations ensuing from then existing competitive threats.   These material misrepresentations and omissions in the 2014 Form 10-K, including the certifications by Defendants

Chabot and Walker, were repeated, in all material respects, in the Forms 10-Q that Tableau filed with the SEC throughout the remainder of the Class Period.

80.    On March 2, 2015, Tableau participated in Morgan Stanley's Technology, Media, & Telecom Conference.  When asked about Tableau's market penetration, Defendant Walker stated, in pertinent part, as follows:

> And so, overall, **we think it's early innings**.  We think there's still a tremendous amount to do, not only reaching all those customers but also from a product innovation standpoint.  You know we're very, very rich in product innovation, and we want to continue doing that.

> In all the world, I can only think of one customer that's 100% penetrated, and that's Tableau.  Everybody at Tableau uses the product in every discipline across the organization.

> All of our customers that we have – we have 26,000, again, that we're proud of.  But there's **ample opportunity to bring analytics to much many more people inside those organizations**.  And so, **we don't feel very penetrated in any of our existing opportunities**.

> And 26,000 out of –.  I think VMware has got over 0.5 million accounts.  **We've got a long way to go to reach a lot more people and companies**.

81.    The statements referenced above in ¶80, that "there's ample opportunity to bring analytics to much many more people inside those organizations," that Tableau does not "feel very penetrated in any of our existing opportunities" and that Tableau has "a long way to go to reach a lot more people and companies," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; and (c) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

82.     When the conference host noted that Tableau's success had attracted a lot of competition, Defendant Walker commented it was "a net positive," stating, in pertinent part, as follows:

> **[W]ith respect to other people coming in and bringing awareness to it, overall that's a net positive**, because you use Salesforce or Tableau all the time.

83.     The statement referenced above in ¶82, that "other people coming in and bringing awareness to [the sector], overall that's a net positive," was false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

84.     The conference host then asked specifically about the effects that new competitive offerings from Qlik and Microsoft were having on Tableau's business.  With respect to Qlik, Defendant Walker commented that it had little effect, calling the offering too complicated and technical, stating, in pertinent part as follows:

> **I don't think that it has changed much in the overall ecosystem.**  I think Qlik and other data discovery vendors are seeing the greenfield opportunity of bringing analytics to that other part of the market that's not just traditional BI.
>
> It's not to say we can't help the traditional BI crowd, but it's really that expansive use cases outside of that is what I think they're seeing and other vendors are seeing as an opportunity, because there are a lot of people who want to unleash the power of data.  **And they're not able to do so, because the tools are too complicated or too technical and they're all gated behind some type of technical project**.  **And that's what we're trying to get away from and empower people**.

With respect to Microsoft's new, aggressively priced offering, Defendant Walker deceptively noted, in pertinent part, as follows:

> Overall, it's Microsoft. So, you always want to take it seriously and that type of thing, but we think of Microsoft as a data provider, quite frankly: MSAS; SQL Server; Power Pivot, which they did a few years ago. **Those are all data sources to us. And so, we continue to complement where people are storing their data**.
>
> Excel, I use Excel every day. **Tableau is not a rip and replace on Excel. We're a supercharger of the data in Excel**, because a lot of people in the world have got databases or data sources all over. And all they do is extract out into Excel. And then, they try and start their analytic experience. **And so, what we're able to do is super charge that. And so, I think we'll continue to do that**.

85.     The statements referenced above in ¶84, that "I don't think that [Qlik's product] has changed much in the overall ecosystem," that Qlik's tools were "too complicated or too technical" such that it could not compete with Tableau, and that, despite Microsoft's product offerings, Tableau would "continue to complement where people are storing their data" and "supercharge" the Excel experience, were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

86.     On March 3, 2015, Tableau participated in Pacific Crest's Emerging Technology Summit. During the conference, Defendant Walker commented that Tableau's market opportunity was "much broader" than the $13 billion to $15 billion business intelligence ("BI") market. When

asked about competition, Defendant Walker reassured the market, stating, in pertinent part, as follows:

> **And so, I don't think that environment has changed drastically, overall**.  And so, there is competition.  There are people who are working . . . But from an overall traditional standpoint, **there is not a change in the guard or anything like that**.  I think it's going.  It think there's a lot of emerging technologies that are out there.  But just like we are always, we're looking to complement data.  So, if people are doing neat things, we want to connect to it.

87.    The statements referenced above in ¶86, that Tableau's market opportunity was "much broader" than the traditional business intelligence market, that "I don't think [the competitive] environment has changed drastically, overall" and that "there is not a change in the guard or anything like that," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

88.    When specifically asked about competition from Salesforce or Microsoft, Defendant Walker called it a "net positive," stating, in pertinent part, as follows:

> And so, hey, there's a lot of awareness on analytics and ease of use analytics, which is positive for everybody, I think, because people are starting to expect they're able to use something easy and get answers to their questions.  And so, **overall, I think it's a net positive to have that awareness**.

89.    The statement referenced above in ¶88, that competition from Salesforce or Microsoft was overall a "net positive" was false and misleading when made because it misrepresented and

failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

90.     On March 3, 2015, Tableau also participated in the JMP Securities Technology Conference.  During the conference, Defendant Walker summarized the competitive dynamics in the marketplace as follows: "[s]o, from a competitive landscape, since we've been public – in May, it will be two years – I don't think it's changed drastically. . . .  I wouldn't call out anybody or any change in trends over the last two years."

91.     The statements referenced above in ¶90, that "I don't think [the competitive landscape has] changed drastically" and that "I wouldn't call out anybody or any change in trends over the last two years," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d)  that, based on the

foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

92.    On May 7, 2015, Tableau issued a press release announcing its financial results for the first quarter of 2015, the period ended March 31, 2015.  Tableau reported total revenue during the quarter of $130.1 million (representing a 75% increase from the first quarter of 2014) and license revenue of $84.4 million (representing a 74% increase from the first quarter of 2014).  Defendant Chabot, commenting on the results, stated, in pertinent part, as follows:

> Tableau's first quarter 2015 results were strong and demonstrate that the demand for Tableau continues to grow.  Tableau's ability to help people achieve more with data is **resulting in an ever growing customer base**.  During the quarter, we added more than 2,600 new customer accounts, bringing the total to more than 29,000 worldwide.

93.    The statement referenced above in ¶92, that "Tableau's ability to help people achieve more with data is resulting in an ever growing customer base," was false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; and (c) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

94.    On May 8, 2015, Tableau filed with the SEC its Form 10-Q for the quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"), which was signed by Defendant Walker.  The Q1 2015 Form 10-Q contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as Defendants Chabot's and Walker's certifications thereon.

95.     The risk factor disclosure included in the Q1 2015 Form 10-Q deceptively referred to *potential risks* associated with generating incremental license revenue from existing customers, when, in fact, such risks were *then existing*, stating, in pertinent part, as follows:

> Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations.
>
> *        *        *
>
> **If** our customers do not purchase additional licenses or capabilities, our revenues **may grow more slowly than expected**, may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management.  There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues.  **If** our efforts to upsell to our customers are not successful, our business would suffer.
>
> *        *        *
>
> **If** our sales cycle were to lengthen . . . events **may** occur during this period that affect the size or timing of a purchase or even cause cancellations, which **may** lead to greater unpredictability in our business and results of operations.

96.     In addition, the MD&A disclosure included in the Q1 2015 Form 10-Q was materially false and misleading in that it failed to disclose the effects of then known events and uncertainties, that were then having, and were reasonably likely to continue to have, a material effect on the Company's operating results, including those events and uncertainties associated with the introduction of software products similar to those of Tableau by large, well-established companies at prices substantially lower than those charged by the Company.

97.     The Q1 2015 Form 10-Q also contained false and misleading representations about Tableau's disclosure controls being effective, when in reality they were poorly designed and "ineffective" in assessing the risk of material misstatements, stating, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

**Under the supervision and with the participation of our principal executive officer and principal financial officer**, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, **our principal executive officer and principal financial officer concluded that our disclosure controls and procedures** are designed to, and **are effective** to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

98.     The representations in the Q1 2015 Form 10-Q about Tableau's disclosure controls

being effective were then falsely and misleadingly certified by Defendants Chabot and Walker:

I, [Defendant Chabot and Defendant Walker], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Tableau Software, Inc.;

2.      **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial

reporting (as defined in Exchange Act Rules 13a-15(f) and 15-d-15(f)) for the registrant and have:

  a. **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities**, particularly during the period in which this report is being prepared;

  b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

  c. **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation**; and

  d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

  a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

  b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

 99. The material misstatements and omissions included in the Q1 2015 Form 10-Q failed to disclose material facts required by SEC rules and regulations associated with adverse effects on Tableau's operations ensuing from then existing competitive threats.

100.    On June 2, 2015, Tableau presented at the Bank of America Merrill Lynch Global Technology Conference.  When asked about market penetration, Defendant Walker commented, in pertinent part, that the $13.0 to $17.0 million traditional BI market was "fertile ground," and that Tableau had a "long way to go" from an overall market penetration standpoint.

101.    The statements referenced above in ¶100, that the traditional BI market was "fertile ground," and that Tableau had a "long way to go" from an overall market penetration standpoint, were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; and (c) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

102.    When asked specifically about market penetration into the installed base for Tableau server, Defendant Walker stated, in pertinent part, that "we don't feel like we're very penetrated in any of those accounts with respect to the tapping out of an opportunity within a customer base."

103.    The statement referenced above in ¶102, that "we don't feel like we're very penetrated in any of those accounts with respect to the tapping out of an opportunity within a customer base," was false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth

rate to decelerate; and (c) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

104.    Concerning the recent product introductions by Saleforce and Qlik, and their impact on the competitive environment, Defendant Walker stated, in pertinent part, as follows:

> **Not much on the overall competitive spectrum**.  I would also highlight is, it's a pretty vast opportunity.  It's bigger than just the traditional BI.  It's reaching a lot more users with different use cases and functional areas.  It is what we're doing, **so it's not like a knife battle on every type of corner**, if you will.

105.    The statements referenced above in ¶104, that there was "[n]ot much on the overall competitive spectrum" and that "it's not like a knife battle on every type of corner," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

106.    On July 29, 2015, Tableau issued a press release announcing its financial results for the second quarter of 2015, the period ended June 30, 2015.  For the quarter, Tableau reported total revenue of $149.9 million (representing an 65% increase from the second quarter of 2014) and license revenue of $96.7 million (representing an 60% increase from the second quarter of 2014). Defendant Chabot, commenting on the financial results, stated that "Tableau executed another strong quarter as we continue to acquire new customers, expand relationships with existing customers, grow

internationally and rapidly innovate.   We are **seeing a strong demand** for Tableau's products **resulting in record customer growth and product adoption**."

107.    The statement referenced above in ¶106, that Tableau was "seeing a strong demand" for its products, was false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; and (c) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

108.    Later that day, Tableau held a conference call with analysts and investors to discuss the Company's earnings release and business.   During the Q&A session of the conference call, Defendants were asked about the nature of the Company's competitive landscape.   In response, Defendant Chabot commented that while the overall competitive landscape "fluctuates" and that there are "a lot of dimensions to the competitive description in this industry," in summary, "**we haven't seen a change in the competitive landscape in this last quarter**."

109.    The statement referenced above in ¶108, that Tableau has not "seen a change in the competitive landscape in this last quarter," was false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition

having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

110.    When asked, in particular, about competition from Microsoft, Defendant Chabot again reiterated that the Company's competitive landscape had not changed, stating, in pertinent part, as follows:

> Microsoft has been a fierce competitor of Tableau really since the beginning, even since the earliest days of the Company.  And as they've tried to find their way with their BI strategy, the competitive dynamic has changed here and there, ebbs and flows as they rev their releases.
>
> **They did just put a new product out on the market, or at least are about to**, in the case of power BI.  **And again, I guess the best news I can report at this point is that we haven't seen a change in the competitive dynamic**.
>
> *       *       *
>
> [Our] constellation of three or four pillars continue to be the competitive juggernaut for Tableau.  **And the recent news from our competitors haven't changed that. But we'll certainly keep in touch on the issue**.

111.    The statements referenced above in ¶110, that Tableau has not "seen a change in the competitive dynamic" and that "the recent news from our competitors" has not changed the "competitive dynamic," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the

foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

112.    On August 7, 2015, Tableau filed with the SEC its Form 10-Q for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"), which was signed by Defendant Walker.  The Q2 2015 Form 10-Q contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as Defendants Chabot's and Walker's certifications thereon.

113.    The risk factor disclosure included in the Q2 2015 Form 10-Q deceptively referred to *potential risks* associated with generating incremental license revenue from existing customers, when, in fact, such risks were *then existing*, stating, in pertinent part, as follows:

> Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations.
>
> **If** our customers do not purchase additional licenses or capabilities, our revenues **may grow more slowly than expected**, may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management.  There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues.  **If** our efforts to upsell to our customers are not successful, our business would suffer.
>
> **If** our sales cycle were to lengthen . . . events **may** occur during this period that affect the size or timing of a purchase or even cause cancellations, which **may** lead to greater unpredictability in our business and results of operations.

114.    In addition, the MD&A disclosure included in the Q2 2015 Form 10-Q was materially false and misleading in that it failed to disclose the effects of then known events and uncertainties, that were then having, and were reasonably likely to continue to have, a material effect on the Company's operating results, including those events and uncertainties associated with the introduction of software products similar to those of Tableau by large, well-established companies at prices substantially lower than those charged by the Company.

115.    The Q2 2015 Form 10-Q also contained false and misleading representations about Tableau's disclosure controls being effective, when in reality they were poorly designed and "ineffective" in assessing the risk of material misstatements, stating, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

**Under the supervision and with the participation of our principal executive officer and principal financial officer,** our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, **our principal executive officer and principal financial officer concluded that our disclosure controls and procedures** are designed to, and **are effective** to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

116.    The representations in the Q2 2015 Form 10-Q about Tableau's disclosure controls being effective were then falsely and misleadingly certified by Defendants Chabot and Walker:

I, [Defendant Chabot and Defendant Walker], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Tableau Software, Inc.;

2.    **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial

- 39 -

condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      a.      **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities**, particularly during the period in which this report is being prepared;

      b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c.      **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures**, as of the end of the period covered by this report based on such evaluation; and

      d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

117.    On August 10, 2015, Tableau participated in the Pacific Crest's Global Technology Leadership Forum.  Concerning its competition, Tableau, through Francois Ajenstat, Vice President and Director of Product Management, commented that while many companies had entered the space, their collective efforts had not been successful, stating, in pertinent part, as follows:

> First off, I've been in this space for 15 years and this is probably the most exciting time to be in the analytics industry, there is so much innovation, so many different companies coming up with new and exciting capabilities that will help customers all over the world.  **What's been really interesting in the past year is how the mega vendors, the Microsofts and SAPs of the world have really come about in this space**.  That strategy for them hasn't necessarily - it's not a new thing.  We've been doing the same playbook for the last four years, whether it's Microsoft every single year, Microsoft has come up with a new Tableau like capability first it was PowerPivot, then it with Power View, then it with Power Map, then it was something else and **none of those has really caught on**.  SAP has done the same thing providing free Tableau like capabilities directly in the products.  Cognos has done same thing, MicroStrategy has done the same thing.  And I bring those up because the **way that they're trying to compete** is by connecting back to their stack and reiterating the old ways that **has not worked** and why people are looking at alternatives like Tableau.

118.    The statements referenced above in ¶117, that "none of [Microsoft's products] has really caught on" and that the "way that [competitors are] trying to compete . . . has not worked," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to, or recklessly disregarded by, Defendant Tableau: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders;  (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Tableau's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Tableau lacked a reasonable basis for its positive statements about its future growth prospects.

119.    On September 10, 2015, Tableau presented at the Citi Global Technology Conference.  When asked about the competitive landscape, Tableau, through Jay Pier ("Pier"),

Senior Vice President of Corporate Development and Strategy, deceptively downplayed the existence of competitive threats stating, in pertinent part, as follows:

> So from a competitive standpoint, **I think we can continue growing even as other companies are successful in this space**.  We see still for – because of our land and expand model, generally we either don't see competition because we've been successful in part of the Company.  And we're expanding to other areas.

> Or it's the traditional B.I. is the alternative.  So the – **from a competitive standpoint**, ha– **we haven't really seen the landscape change that materially** from traditional B.I., your first category.

> The second one, I think **Qlik and other – TIPCO, we see less so in the market than a few years ago**.  But I think Qlik has been growing – has had healthy growth and had innovated on their products.

> \*        \*        \*

> Regards to Salesforce and the cloud analytics competitors, **largely not seeing them in our deals of yet**.  I think with Salesforce in particular, they're in their use case.  Where – what we're finding with our customers is one, their data isn't just in the cloud.  But it's in the various repositories as we talked about.

> But at least in our deals, and there's a quarterly competitive dashboard.  **Haven't seen Salesforce really materialize** on that as a – and then Microsoft, we're also Seattle-based company, have seen their various generations.  I guess would – we've downloaded Microsoft Power B.I.

> And there's – I'd say it would be easy charting capabilities.  **But the rich analytic experience and the power of our products is still a big difference with Microsoft**.

120.    The statements referenced above in ¶119, that "I think we can continue growing even as other companies are successful in this space," that "from a competitive standpoint . . . we haven't really seen the landscape change that materially" and that Tableau is "largely not seeing [Salesforce and the cloud analytics competitors] in our deals of yet," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to, or recklessly disregarded by, Defendant Tableau: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle

to lengthen and its growth rate to decelerate; (c) that Tableau's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Tableau lacked a reasonable basis for its positive statements about its future growth prospects.

121.    On September 16, 2015, Tableau participated in the Deutsche Bank Technology Conference.  Concerning competition from Salesforce, the following exchange, in pertinent part, took place:

Karl Keirstead - Deutsche Bank, Analyst:

So **Salesforce updated its analytics cloud with a new version 2**.  And yesterday they spent some time talking about the data visualization capabilities, et cetera.  So let's start there.  Just because it's fresh in everybody's minds.  **Has that even hit the radar of Tableau and your reps yet when they're out closing business**?

Defendant Walker:

**No.  Not so much**.  I mean it was released last year.  I think they were pricing it more towards their top-end customers.

122.    The statement referenced above in ¶121, that competition from Salesforce had not hit the radar of Tableau and its representatives, was false and misleading when made because it misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

123.    With respect to competition from Microsoft, the following exchange, in pertinent part, transpired:

Karl Keirstead - Deutsche Bank, Analyst:

**Let's talk a little bit about Microsoft.  They're another big vendor that has a little bit of Tableau envy, and are coming out with updated cloud-based cheap Power BI tools to try to wedge their way into the space.  Is that one hitting the radar**?

Defendant Walker:

Yes. And so again, product release year.  So it's definitely one of the things that I would think even Gartner I think put out a thing on that last month.  **Without a doubt, people will consider it**.  Because it's part of their ELAs.  And so this is the first time that they've broken it away from Excel.  Traditionally their analytics have all been embedded in Excel.

*        *        *

And **it's basically** – it's dashboarding.  **It's creating a dashboard.  So it's got a good dashboard creation.  And that's where it stops.  It's not going to necessarily go deeper**.  That doesn't mean they will not continue to innovate on it.  But in a bake-off with Tableau, **you can do a lot more with Tableau than you could with that product**.  And so I think that's our approach.  And that's why we'll continue to innovate and make it better.  But you've always got to be aware and concerned of the competitive pressures, especially with somebody who spends more on marketing than we have in revenue.

124.    The statements referenced above in ¶123, minimizing the abilities of Microsoft's product and competition and stating "you can do a lot more with Tableau than you could with that product," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Walker or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Walker's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing,

Defendant Walker lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

125.    On November 5, 2015, Tableau issued a press release announcing its financial results for the third quarter of 2015, the period ended September 30, 2015.  For the quarter, Tableau reported total revenue of $170.8 million (representing an 64% increase from the third quarter of 2014), and license revenue of $109.5 million (representing an 57% increase from the third quarter of 2014).  Defendant Chabot, commented on the financial results, stating, in pertinent part, as follows:

> I am very pleased with Tableau's performance this quarter.  We continue to **demonstrate solid business growth** as more customers embrace the Tableau way of analytics with **great enthusiasm and success**.  As a result, we had another record quarter of new customer wins.  More than 3,100 new customer accounts were added in Q3, bringing the total to more than 35,000 worldwide.

126.    The statements referenced above in ¶125, that "[w]e continue to demonstrate solid business growth" and that more customers were embracing Tableau's analytics with "great enthusiasm and success," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

127.    Later that day, Tableau held a conference call with analysts and investors to discuss the Company's earnings release and business.  During the Q&A session of the conference call, Defendants were asked about the then existing competitive landscape given the wave of new product

introductions in the marketplace.  Defendant Chabot again falsely and misleadingly dismissed the

significance of competitive threats, stating, in pertinent part, as follows:

> We believe the **forward situation will be similar to the historical ones**, which is many of those tools will be able to carve out some niche and be able to achieve some level of success with customers **but will not fundamentally change the dynamics of competition in business analytics platforms**.
>
>      *   *   *
>
> Although there has been more noise [competition], as you mentioned with regard to offerings of that profile, I'll close where I began, **which is we don't see it fundamentally changing the competitive dynamic for Tableau**.

128.  The statements referenced above in ¶127, that "forward [competitive] situation will

be similar to the historical ones," that competitive products "will not fundamentally change the

dynamics of competition" and "we don't see [the products] fundamentally changing the competitive

dynamic for Tableau," were false and misleading when made because they misrepresented and failed

to disclose the following adverse facts, which were known to Defendant Chabot or recklessly

disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by

Tableau's competitors was causing the Company's customers to delay and cancel pending license

orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth

rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no

adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the

foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's

future growth prospects.

129.  When asked if customers would "kick the tires" on newly issued competitor products,

and if such products had extended Tableau's sales cycles, Defendant Chabot falsely and misleading

stated, in pertinent part, as follows:

**The short answer is no**, in the sense that when there are new products available to customers, generally speaking, they don't increase the number of things they're looking at.  **They just change the mix of the ones they are choosing to look at**.

\*        \*        \*

**We haven't seen a significant change there.  I would add, at this point, I don't predict one.**  Again, for the same reason, which is I think those competitive changes are largely about changing the mix of who's being considered as opposed to fundamentally changing the way customers are evaluating product.

130.    The statements referenced above in ¶129, that new products would not change Tableau's place in the market, and that there has not been "a significant change" in the competitive landscape, nor was one predicted, were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

131.    On November 9, 2015, Tableau filed with the SEC its Form 10-Q for the quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q"), which was signed by Defendant Walker. The Q3 2015 Form 10-Q contained false and misleading MD&A, risk factor and disclosure control disclosures, as well as Defendants Chabot's and Walker's certifications thereon.

132.    The risk factor disclosure included in the Q3 2015 Form 10-Q deceptively referred to **potential risks** associated with generating incremental license revenue from existing customers, when, in fact, such risks were **then existing**, stating, in pertinent part, as follows:

Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations.

**If** our customers do not purchase additional licenses or capabilities, our revenues **may grow more slowly than expected**, may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management.  There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues.  **If** our efforts to upsell to our customers are not successful, our business would suffer.

*          *          *

**If** our sales cycle were to lengthen . . . events **may** occur during this period that affect the size or timing of a purchase or even cause cancellations, which **may** lead to greater unpredictability in our business and results of operations.

133.    In addition, the MD&A disclosure included in the Q3 2015 Form 10-Q was materially false and misleading in that it failed to disclose the effects of then known events and uncertainties, that were then having, and were reasonably likely to continue to have, a material effect on the Company's operating results, including those events and uncertainties associated with the introduction of software products similar to those of Tableau by large, well-established companies at prices substantially lower than those charged by the Company.

134.    The Q3 2015 Form 10-Q also contained false and misleading representations about Tableau's disclosure controls being effective, when in reality they were poorly designed and "ineffective" in assessing the risk of material misstatements, stating, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

**Under the supervision and with the participation of our principal executive officer and principal financial officer**, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control

objectives.  In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, **our principal executive officer and principal financial officer concluded that our disclosure controls and procedures** are designed to, and **are effective** to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

135.    The representations in the Q3 2015 Form 10-Q about Tableau's disclosure controls

being effective were then falsely and misleadingly certified by Defendants Chabot and Walker:

I, [Defendant Chabot and Defendant Walker], certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Tableau Software, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

- 49 -

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

136.    On November 17, 2015, Tableau participated in the UBS Global Technology Conference.  When asked about the competition from MicroStrategy and Microsoft, Defendant Chabot stated, in pertinent part, as follows:

> **MicroStrategy hasn't been a competitor – a major competitor factor for us for many years**.  Their offerings to try to compete with Tableau remain fairly tied into their own little proprietary ecosystem, that isn't growing very fast.  In fact, I think it's shrinking.  And so we just – we don't have much to say about it.  We don't – **it's not a big competitive concern for us**.

> **Microsoft**, of course, **is**.  They are **a fierce competitor and a good company**.  We are Seattle-based.  I mean, seemingly half of our people are married to people who work at Microsoft.  We take them seriously.  People write off Microsoft, we're not that way at all.  We're a Seattle company, this never occurred to you.  And we can be – we've been competing with them since the day I founded the Company.  Our first office space was a bedroom in Capitol Hill in Seattle, a few miles away from Microsoft.  **So they've always been a competitor to us**.

- 50 -

**And luckily they have spent most of that decade fumbling around,** by the way they would tell you that, I'm not trying to – I mean, they had what was it, the Point of service and then performance point, and then some share point integration play with their BI solution and then they went to Power Query and then, oops we didn't mean that, we meant Power BI and then literally your mind spin is trying to keep track of their BI strategy. I'll be more pointed in just bring you up to date. So that's just been the general up to date and people other than me will tell you that it's just sort of the way they have behaved for the last decade. **The customers are just left reeling and confused and their BI products are not loved as a result**.

137.    The statements referenced above in ¶136, that "MicroStrategy hasn't been a competitor – a major competitor factor for us for many years," that Microsoft has "spent most of that decade fumbling around" and that as a result, Tableau's competitors are "left reeling and confused and their BI products are not loved," were false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendant Chabot or recklessly disregarded by him: (a) that the introduction of new, aggressively-priced software offerings by Tableau's competitors was causing the Company's customers to delay and cancel pending license orders; (b) that competitive products were causing Tableau's sales cycle to lengthen and its growth rate to decelerate; (c) that Defendant Chabot's statements about competition having little or no adverse effect on the Company's business were deceptive half-truths; and (d) that, based on the foregoing, Defendant Chabot lacked a reasonable basis for his positive statements about Tableau's future growth prospects.

138.    On January 7, 2016, Tableau abruptly disclosed that Kelly Wright, its Executive Vice President of Sales, would leave the Company by the end of the year, signaling instability in its sales operations.

139.    Then, after the market closed on February 4, 2016, the last day of the Class Period, Tableau issued a press release announcing its financial results for its 2015 fourth quarter and fiscal year end, the periods ended December 31, 2015. For the fourth quarter of 2015, Tableau reported total revenue of $202.8 million (representing a 42% increase from the fourth quarter of 2014) and

license revenue of $133.1 million (representing a 31% increase from the fourth quarter of 2014).  For the year 2015, Tableau reported total revenue of $653.6 million (representing an 58% increase from 2014) and license revenue of $423.8 million (representing a 51% increase from 2014).

140.    In addition, Tableau announced that it recognized an income tax expense due to the recognition of a $46.7 million deferred tax "valuation allowance."  Under applicable accounting rules, a tax valuation allowance is recorded when a Company does not expect it will not be able to realize the benefits of its deferred tax assets, primarily due to a lack of sufficient expected future profits.

141.    Thus, by recording a tax valuation allowance, Defendants told the marketplace that they believed that it was unlikely that Tableau would be able to generate future income sufficient to realize its deferred tax assets.  This announcement, coupled with Defendants' disclosure that it expected the Company's 2016 first quarter revenue growth rate to decline to approximately 25% on a year-over-year- basis (from 75%, 65%, 64% and 42% during the first, second, third and fourth quarters of 2015, respectively) told the marketplace that aggressively priced offerings by Tableau's competitors were having a materially adverse effect on the Company's business.

142.    Later that day, Tableau held a conference call with analysts and investors to discuss the Company's financial results and operations.  While Defendant Walker deceptively tried to attribute the weakness in the Company's results to macroeconomic factors, stating, in pertinent part, that "we saw some softness in spending, especially in North America," Defendant Chabot acknowledged that competition was adversely impacting Tableau's business, stating in pertinent part, as follows:

> Over the years, the **competitive dynamic has become more crowded and difficult.** Tableau and a few other companies have pioneered this new way of visual analytics that I described earlier.  And a lot of people caught gotten notice.  So there **are more**

**and more companies with offerings in the arena.  So it has gotten thicker and thicker over the years, so to speak**.

143.    Following these announcements, the price of Tableau common stock plunged ***nearly 50%*** on very heavy trading volume, from $81.75 per share on February 4, 2016 to $41.33 per share on February 5, 2016.

144.    Thereafter, securities analysts slashed their price targets on Tableau common stock and issued research reports noting, among other things: the Company's "big growth deceleration;" the "specter of increasing competition and potential saturation in Tableau's customer base"; and that they were "not convinced" Tableau marked growth deceleration was due to macro-economic factors.

## ADDITIONAL SCIENTER ALLEGATIONS

145.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading.  The Individual Defendants knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

146.    By virtue of their receipt of information reflecting the true facts regarding Tableau's operations and the market in which it operated, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Tableau, the Individual Defendants were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the alleged false and misleading information they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or reckless complicity of

personnel at the highest level of the Company, including the Individual Defendants and other senior executives.

147.     Numerous facts support a strong inference of the Individual Defendants' scienter during the Class Period, including: (a) the magnitude of insider stock sales; (b) the Individual Defendants' knowledge of the effects that competition was having on internal metrics designed to gauge Tableau's business outlook; (c) Defendants' obligations associated with Tableau's disclosure controls; and (d) the misstatements and omissions of material facts concerning the Company's core operations, including the effect competition was having on the Company's future business prospects, about which several of the Individual Defendants were repeatedly questioned and spoke.

148.     Further, the scienter of the Individual Defendants, because of their executive level positions with the Company, can be imputed to Defendant Tableau.

### Defendants Were Motivated to Artificially Inflate Tableau's Stock Price to Enable Corporate Insiders to Profit from Their Sales of Tableau Stock

149.     Defendants were motivated to engage in their fraudulent course of conduct in order to allow high-level Tableau officers and directors, including the Individual Defendants, to sell shares of their personally-held Tableau common stock at inflated prices, which yielded them gross proceeds of more than *$371 million* during the short 12-month Class Period ($335 million of which was sold by the Individual Defendants), as follows:[3]

| Tableau Software, Inc. Insider Sales: 02/05/15 - 02/04/16 | | | | | |
|---|---|---|---|---|---|
| **Filer Name** | **Title** | **Date** | **Shares** | **Price** | **Proceeds** |
| | | | | | |
| Baskett, Forest | Director | 02/11/15 | 10,500 | $96.00 | $1,008,000 |
| | | 11/24/15 | 26,667 | $93.97 | $2,505,898 |
| | | | 37,167 | | $3,513,898 |

---

[3]      Lead Plaintiff's counsel used publicly-available trading data that Company insiders filed with the SEC on Forms 4 to evaluate their selling activity.  Accordingly, the Forms 4 filed with the SEC by Company insiders during the Class Period are hereby incorporated by reference.

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | | | | |
| Chabot, Christian | CEO | 02/09/15 | 50,958 | $94.11 | $4,795,657 |
| | | 02/09/15 | 82,242 | $93.43 | $7,683,870 |
| | | 02/09/15 | 4,800 | $95.00 | $456,000 |
| | | 02/10/15 | 48,796 | $95.52 | $4,660,994 |
| | | 02/10/15 | 33,004 | $94.58 | $3,121,518 |
| | | 02/10/15 | 33,474 | $93.57 | $3,132,162 |
| | | 02/10/15 | 10,726 | $92.69 | $994,193 |
| | | 02/11/15 | 6,500 | $96.77 | $629,005 |
| | | 02/11/15 | 29,500 | $96.06 | $2,833,770 |
| | | 02/13/15 | 10,221 | $100.00 | $1,022,100 |
| | | 02/17/15 | 104 | $98.15 | $10,208 |
| | | 02/19/15 | 120,379 | $100.12 | $12,052,345 |
| | | 02/20/15 | 19,400 | $100.37 | $1,947,178 |
| | | 05/12/15 | 10,365 | $108.05 | $1,119,938 |
| | | 05/12/15 | 1,000 | $110.61 | $110,610 |
| | | 05/12/15 | 91,351 | $109.84 | $10,033,994 |
| | | 05/12/15 | 47,284 | $108.98 | $5,153,010 |
| | | 05/18/15 | 83 | $110.51 | $9,172 |
| | | 08/03/15 | 150,000 | $101.12 | $15,168,000 |
| | | 08/17/15 | 90 | $106.50 | $9,585 |
| | | 11/10/15 | 5,500 | $97.44 | $535,920 |
| | | 11/10/15 | 56,325 | $95.92 | $5,402,694 |
| | | 11/10/15 | 21,675 | $96.61 | $2,094,022 |
| | | 11/11/15 | 14,500 | $95.92 | $1,390,840 |
| | | 11/11/15 | 52,000 | $95.32 | $4,956,640 |
| | | 11/16/15 | 88 | $93.13 | $8,195 |
| | | | 900,365 | | $89,331,622 |
| | | | | | |
| Conder, Keenan Michael | General Counsel | 02/19/15 | 4,037 | $98.06 | $395,868 |
| | | 02/19/15 | 1,465 | $99.69 | $146,046 |
| | | 02/19/15 | 6,498 | $99.10 | $643,952 |
| | | 02/26/15 | 2,948 | $98.46 | $290,260 |
| | | 02/26/15 | 3,252 | $99.35 | $323,086 |
| | | 02/26/15 | 1,300 | $100.22 | $130,286 |
| | | 05/12/15 | 2,112 | $109.54 | $231,348 |
| | | 05/12/15 | 5,888 | $108.53 | $639,025 |
| | | | 27,500 | | $2,799,871 |
| | | | | | |
| Fink, Elissa | Officer | 02/17/15 | 2,791 | $98.32 | $274,411 |
| | | 02/17/15 | 3,009 | $97.35 | $292,926 |
| | | 02/17/15 | 1,700 | $99.07 | $168,419 |
| | | 02/18/15 | 1,930 | $99.58 | $192,189 |
| | | 02/18/15 | 5,570 | $98.89 | $550,817 |
| | | 02/19/15 | 6,633 | $99.56 | $660,381 |
| | | 02/19/15 | 5,167 | $98.85 | $510,758 |
| | | 02/19/15 | 3,200 | $97.78 | $312,896 |
| | | 02/20/15 | 10,110 | $100.47 | $1,015,752 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 02/20/15 | 4,890 | $99.64 | $487,240 |
| | | 02/26/15 | 700 | $101.14 | $70,798 |
| | | 02/26/15 | 11,980 | $100.27 | $1,201,235 |
| | | 05/13/15 | 1,700 | $110.10 | $187,170 |
| | | 05/13/15 | 3,300 | $109.30 | $360,690 |
| | | 05/14/15 | 1,400 | $111.34 | $155,876 |
| | | 05/14/15 | 1,500 | $110.31 | $165,465 |
| | | 05/14/15 | 2,100 | $112.27 | $235,767 |
| | | 05/15/15 | 1,772 | $112.03 | $198,517 |
| | | 05/15/15 | 8,228 | $111.32 | $915,941 |
| | | 05/18/15 | 200 | $111.41 | $22,282 |
| | | 05/18/15 | 15,700 | $110.59 | $1,736,263 |
| | | 05/18/15 | 3,900 | $110.00 | $429,000 |
| | | 05/18/15 | 200 | $111.24 | $22,248 |
| | | 08/14/15 | 5,000 | $105.30 | $526,500 |
| | | 08/17/15 | 5,000 | $106.91 | $534,550 |
| | | 08/18/15 | 10,000 | $107.39 | $1,073,900 |
| | | 08/19/15 | 5,826 | $105.48 | $614,526 |
| | | 08/19/15 | 7,874 | $104.67 | $824,172 |
| | | 08/19/15 | 6,300 | $106.55 | $671,265 |
| | | | 137,680 | | $14,411,954 |
| | | | | | |
| Hanrahan, Patrick | Officer and Director | 02/09/15 | 7,200 | $94.49 | $680,328 |
| | | 02/09/15 | 17,239 | $93.24 | $1,607,364 |
| | | 02/09/15 | 21,561 | $92.65 | $1,997,627 |
| | | 02/09/15 | 4,000 | $95.01 | $380,040 |
| | | 02/10/15 | 17,173 | $92.21 | $1,583,522 |
| | | 02/10/15 | 28,112 | $93.16 | $2,618,914 |
| | | 02/10/15 | 4,715 | $93.70 | $441,796 |
| | | 02/11/15 | 50,000 | $95.82 | $4,791,000 |
| | | 02/12/15 | 14,384 | $98.10 | $1,411,070 |
| | | 02/12/15 | 35,616 | $97.21 | $3,462,231 |
| | | 05/14/15 | 6,700 | $110.32 | $739,144 |
| | | 05/14/15 | 3,136 | $112.92 | $354,117 |
| | | 05/14/15 | 44,264 | $112.37 | $4,973,946 |
| | | 05/14/15 | 10,900 | $111.35 | $1,213,715 |
| | | 05/19/15 | 30,000 | $113.00 | $3,390,000 |
| | | 08/13/15 | 65,000 | $104.08 | $6,765,200 |
| | | 11/12/15 | 26,611 | $95.48 | $2,540,818 |
| | | 11/12/15 | 19,469 | $97.50 | $1,898,228 |
| | | 11/12/15 | 15,320 | $96.40 | $1,476,848 |
| | | 11/12/15 | 3,600 | $98.21 | $353,556 |
| | | | 425,000 | | $42,679,464 |
| | | | | | |
| Jurgensen, Elliot H. Jr. | Director | 02/09/15 | 5,500 | $95.00 | $522,500 |
| | | 05/20/15 | 2,500 | $113.19 | $282,975 |
| | | 11/13/15 | 4,000 | $93.78 | $375,120 |
| | | | 12,000 | | $1,180,595 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| Seawell, A. Brooke | Director | 02/09/15 | 197 | $95.00 | $18,715 |
| | | 02/10/15 | 500 | $95.46 | $47,730 |
| | | 02/10/15 | 295 | $95.50 | $28,173 |
| | | 02/11/15 | 5,000 | $97.68 | $488,400 |
| | | 05/14/15 | 5,796 | $112.02 | $649,268 |
| | | | 11,788 | | $1,232,285 |
| | | | | | |
| Stolte, Christopher R. | Officer and Director | 02/09/15 | 25,049 | $94.14 | $2,358,113 |
| | | 02/09/15 | 2,500 | $95.00 | $237,500 |
| | | 02/09/15 | 52,938 | $93.50 | $4,949,703 |
| | | 02/10/15 | 41,157 | $95.58 | $3,933,786 |
| | | 02/10/15 | 39,313 | $93.85 | $3,689,525 |
| | | 02/10/15 | 14,196 | $92.84 | $1,317,957 |
| | | 02/10/15 | 36,922 | $94.93 | $3,505,005 |
| | | 02/11/15 | 33,925 | $96.12 | $3,260,871 |
| | | 02/11/15 | 4,000 | $96.97 | $387,880 |
| | | 02/13/15 | 30,353 | $100.00 | $3,035,300 |
| | | 02/17/15 | 104 | $98.15 | $10,208 |
| | | 02/19/15 | 132,597 | $100.14 | $13,278,264 |
| | | 02/20/15 | 72,350 | $100.37 | $7,261,770 |
| | | 02/26/15 | 14,700 | $100.00 | $1,470,000 |
| | | 03/03/15 | 150,000 | $94.43 | $14,164,500 |
| | | 05/12/15 | 67,375 | $110.10 | $7,417,988 |
| | | 05/12/15 | 113,912 | $109.57 | $12,481,338 |
| | | 05/12/15 | 30,213 | $108.38 | $3,274,485 |
| | | 05/13/15 | 9,977 | $109.95 | $1,096,971 |
| | | 05/13/15 | 28,523 | $109.15 | $3,113,285 |
| | | 05/18/15 | 84 | $110.45 | $9,278 |
| | | 06/01/15 | 31,500 | $112.02 | $3,528,630 |
| | | 06/01/15 | 95,229 | $112.94 | $10,755,163 |
| | | 06/01/15 | 23,271 | $113.54 | $2,642,189 |
| | | 08/03/15 | 160,000 | $101.23 | $16,196,800 |
| | | 08/04/15 | 90,000 | $100.05 | $9,004,500 |
| | | 08/17/15 | 90 | $106.50 | $9,585 |
| | | 09/01/15 | 67,075 | $92.58 | $6,209,804 |
| | | 09/01/15 | 82,925 | $93.32 | $7,738,561 |
| | | 11/10/15 | 21,862 | $96.62 | $2,112,306 |
| | | 11/10/15 | 5,100 | $97.48 | $497,148 |
| | | 11/10/15 | 70,038 | $95.96 | $6,720,846 |
| | | 11/11/15 | 97,897 | $95.87 | $9,385,385 |
| | | 11/11/15 | 43,490 | $94.97 | $4,130,245 |
| | | 11/11/15 | 11,613 | $96.42 | $1,119,725 |
| | | 11/16/15 | 88 | $93.13 | $8,195 |
| | | | 1,700,366 | | $170,312,810 |
| | | | | | |
| Walker, Thomas E. Jr. | CFO | 02/09/15 | 62,503 | $93.81 | $5,863,406 |
| | | 02/09/15 | 58,009 | $93.10 | $5,400,638 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 02/09/15 | 9,488 | $94.98 | $901,170 |
| | | 02/17/15 | 135 | $98.32 | $13,273 |
| | | 03/04/15 | 20,000 | $91.25 | $1,825,000 |
| | | 05/12/15 | 24,146 | $108.29 | $2,614,770 |
| | | 05/12/15 | 15,854 | $109.17 | $1,730,781 |
| | | 05/18/15 | 132 | $110.51 | $14,587 |
| | | 06/01/15 | 17,000 | $113.06 | $1,922,020 |
| | | 06/01/15 | 3,000 | $111.79 | $335,370 |
| | | 07/31/15 | 5,000 | $106.19 | $530,950 |
| | | 07/31/15 | 15,000 | $106.64 | $1,599,600 |
| | | 08/03/15 | 15,000 | $103.36 | $1,550,400 |
| | | 08/03/15 | 5,000 | $104.65 | $523,250 |
| | | 08/17/15 | 136 | $106.50 | $14,484 |
| | | 09/01/15 | 20,000 | $93.08 | $1,861,600 |
| | | 11/10/15 | 40,000 | $97.23 | $3,889,200 |
| | | 11/16/15 | 135 | $93.13 | $12,573 |
| | | 12/01/15 | 3,200 | $97.34 | $311,488 |
| | | 12/01/15 | 16,800 | $97.00 | $1,629,600 |
| | | | 330,538 | | $32,544,161 |
| | | | | | |
| Wright, Kelly Breslin | Officer | 02/11/15 | 38,197 | $97.31 | $3,716,950 |
| | | 02/13/15 | 38,197 | $99.59 | $3,804,039 |
| | | 05/14/15 | 800 | $111.73 | $89,384 |
| | | 05/14/15 | 2,950 | $112.50 | $331,875 |
| | | 05/15/15 | 2,850 | $110.47 | $314,840 |
| | | 05/15/15 | 900 | $111.25 | $100,125 |
| | | 05/19/15 | 1,250 | $112.11 | $140,138 |
| | | 05/19/15 | 2,300 | $114.62 | $263,626 |
| | | 05/19/15 | 200 | $115.26 | $23,052 |
| | | 05/20/15 | 1,500 | $113.62 | $170,430 |
| | | 05/20/15 | 2,250 | $113.01 | $254,273 |
| | | 05/27/15 | 900 | $112.55 | $101,295 |
| | | 05/27/15 | 1,300 | $113.96 | $148,148 |
| | | 05/27/15 | 1,550 | $114.67 | $177,739 |
| | | 05/28/15 | 100 | $113.93 | $11,393 |
| | | 05/28/15 | 200 | $113.86 | $22,772 |
| | | 05/28/15 | 3,450 | $113.16 | $390,402 |
| | | 06/01/15 | 2,550 | $112.92 | $287,946 |
| | | 06/01/15 | 900 | $111.81 | $100,629 |
| | | 06/01/15 | 300 | $113.52 | $34,056 |
| | | 06/02/15 | 250 | $113.66 | $28,415 |
| | | 06/02/15 | 1,480 | $111.91 | $165,627 |
| | | 06/02/15 | 1,970 | $112.97 | $222,551 |
| | | 06/02/15 | 50 | $113.67 | $5,684 |
| | | 08/18/15 | 1,300 | $107.28 | $139,464 |
| | | 08/18/15 | 1,832 | $106.08 | $194,339 |
| | | 08/18/15 | 200 | $108.00 | $21,600 |
| | | 08/19/15 | 1,100 | $105.63 | $116,193 |

| Filer Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 08/19/15 | 400 | $106.63 | $42,652 |
| | | 08/19/15 | 1,832 | $104.72 | $191,847 |
| | | 08/24/15 | 300 | $96.45 | $28,935 |
| | | 08/24/15 | 367 | $94.41 | $34,648 |
| | | 08/24/15 | 1,967 | $99.98 | $196,661 |
| | | 08/24/15 | 600 | $97.83 | $58,698 |
| | | 08/24/15 | 100 | $101.39 | $10,139 |
| | | 08/25/15 | 400 | $97.10 | $38,840 |
| | | 08/25/15 | 500 | $98.52 | $49,260 |
| | | 08/25/15 | 2,267 | $100.04 | $226,791 |
| | | 08/25/15 | 167 | $95.33 | $15,920 |
| | | 09/02/15 | 167 | $95.17 | $15,893 |
| | | 09/02/15 | 900 | $92.74 | $83,466 |
| | | 09/02/15 | 600 | $94.10 | $56,460 |
| | | 09/03/15 | 700 | $95.68 | $66,976 |
| | | 09/03/15 | 767 | $94.56 | $72,528 |
| | | 09/03/15 | 200 | $96.60 | $19,320 |
| | | 11/12/15 | 400 | $97.85 | $39,140 |
| | | 11/12/15 | 450 | $95.48 | $42,966 |
| | | 11/12/15 | 400 | $96.54 | $38,616 |
| | | 11/13/15 | 600 | $94.79 | $56,874 |
| | | 11/13/15 | 650 | $93.85 | $61,003 |
| | | 11/17/15 | 1,250 | $93.47 | $116,838 |
| | | 11/18/15 | 100 | $95.22 | $9,522 |
| | | 11/18/15 | 1,150 | $94.69 | $108,894 |
| | | 11/23/15 | 1,150 | $95.15 | $109,423 |
| | | 11/23/15 | 100 | $95.80 | $9,580 |
| | | 11/24/15 | 350 | $94.59 | $33,107 |
| | | 11/24/15 | 900 | $93.80 | $84,420 |
| | | 12/01/15 | 250 | $97.95 | $24,488 |
| | | 12/01/15 | 1,000 | $97.31 | $97,310 |
| | | 12/02/15 | 450 | $94.96 | $42,732 |
| | | 12/02/15 | 800 | $96.19 | $76,952 |
| | | | 133,060 | | $13,537,878 |
| | | | | | |
| | | | | | |
| | **Totals** | | **3,715,464** | | **$371,544,539** |

150.   The 3.7 million shares sold by Tableau's officers and directors during the Class Period were highly unusual in both amount (based on the sheer dollar value of shares sold) and timing (made at a time that Lead Plaintiff alleges Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).

151.    For example, during the twelve month Class Period, the collective proceeds from Tableau stock sales during the one year Class Period by Company officers yielded them proceeds that were *33%* greater than the preceding one year period.  Similarly, the collective proceeds from Tableau stock sales by the Individual Defendants yielded them proceeds that were *36%* greater than the preceding one year period.

152.    In addition, during the short twelve month Class Period, the Individual Defendants collectively sold approximately *$335 million* in Tableau common stock, an amount equivalent to almost *$28 million per month*.  In fact, Defendants Chabot and Stolte, each of whom served as executive Company officers, respectively sold the equivalent of 13% and 27% of their pre-Class Period Tableau stock holdings, and Defendant Walker sold the equivalent of all of his pre-Class Period Tableau stock holdings, as well an additional 366,806 Tableau shares he acquired pursuant to equity compensation arrangements during the Class Period.  As a result, in a twelve month period, Defendants Chabot, Hanrahan and Walker respectively pocketed *$89.3 million, $42.7 million* and *$32.5 million* in Tableau stock sale proceeds, and Defendant Stolte, who, in his capacity as the Company's "Chief Development Officer" was well aware of the technological threats being posed by Tableau's competitors, sold an astounding *$170.3 million*, or *more than $14 million per month* in Company stock.

153.    The timing of the Individual Defendants' sales activity also supports a strong inference of scienter in that a vast majority of their sales were made within days of the Company's positive earnings announcements during the Class Period.

154.    Accordingly, the Individual Defendants were motivated to make materially false and misleading statements and conceal material adverse information from investors so that they could

personally profit from the artificial inflation in the trading price of Tableau common stock resulting from their false and misleading statements and omissions during the Class Period.

155.    Indeed, Defendants, by their own admission, were surprised that competition did not result in a more pronounced adverse impact on Tableau's financial performance early in the Class Period.  On March 3, 2015, Tableau participated in Pacific Crest's Emerging Technology Summit. During the conference, Defendant Walker noted that the Company's performance during 2014 was better than Defendants had expected heading into 2014, stating, in pertinent part, as follows:

> Overall, when we entered 2014, it was a year after our IPO.  And so, 2013 was also a banner year for Tableau.  And so, entering [2014], **we were not expecting the same kind of pop or momentum** into 2014 that we experienced.

156.    Given that the Company had been performing even better than they expected, the Individual Defendants were further motivated to conceal the adverse information about Tableau's competitive environment so that they could benefit from the artificial inflation in the price of Tableau's common stock and collectively pocket approximately $335 million in common stock proceeds.

157.    In addition, the selling activity of members of the Company's Board of Directors, and other insiders is also probative of Defendants' scienter, as they would have had access to material non-public information regarding the Company at the time they sold their shares, especially since FEs reported that sales information was readily accessible to anyone at the Company.

### The Individual Defendants Were Knowledgeable About the Effect that Competition Was Having on Internal Metrics Designed to Gauge Tableau's Business Outlook

158.    As noted herein, numerous FEs of Tableau acknowledged that management closely monitored the Company's future business trends by, among other things, internally monitoring the length of Tableau's sales cycle, the license deals it was losing to competition, and the number of sales representatives who were missing their respective sales quotas.  Each of these internal metrics

indicated that product introductions by Tableau's competitors were then having, and were reasonably likely to continue to have, a material adverse effect on the Company's business outlook.

159.    Nonetheless, during the Class Period, Defendants repeatedly misrepresented to investors that Tableau's competitive landscape had not changed and falsely reassured investors about the effects of new product offerings on the Company's business.  Accordingly, Defendants knew, or recklessly disregarded, that their representations to investors during the Class Period were materially false and misleading when made.

### The Individual Defendants' Disclosure Control Obligations

160.    Defendants' scienter is also underscored by the Sarbanes-Oxley mandated certifications of Defendants Chabot and Walker, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Tableau was made known to them and that the Company's disclosure controls were operating effectively.

161.    During the Class Period, Defendants Chabot and Walker repeatedly assured the market and certified that they had undertaken an assessment and evaluation of the Company's disclosures.  This further establishes that these defendants knowingly misled the market, or were reckless in making such representations and executing such certifications.

### Defendants' Misstatements and Omissions Concerning the Company's Core Operations

162.    Lead Plaintiff alleges that the known, but undisclosed, adverse facts about the Company during the Class Period can be imputed to the Individual Defendants who, as executive officers of the Company, knew or recklessly ignored facts related to the core operations of Tableau.

163.    The significance of competitive pressures on the Company's core business operations is evidenced by the questions about competition by securities analysts that were repeated at virtually every public conference attended by the Individual Defendants and other senior executives

throughout the Class Period.  As detailed herein, Defendants knew of the material adverse impact that competition was having, and was reasonably likely to continue to have, on the Company's core operations.

## LOSS CAUSATION

164.    During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Tableau common stock.  This scheme operated as a fraud or deceit on Class Period purchasers of Tableau common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the price of Tableau common stock fell precipitously as the prior artificial inflation came out.

165.    As a result of their purchases of Tableau common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Tableau common stock fell precipitously as the prior artificial inflation dissipated.  Defendants' false and misleading statements had the intended effect and caused Tableau common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $131.34 per share on July 23, 2015.

166.    By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Tableau's outlook, business, and prospects.  Defendants' false and misleading statements had the intended effect and caused Tableau common stock to trade at artificially inflated levels throughout the Class Period.

167.    The decline in the price of Tableau common stock after the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent

misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in Tableau common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Tableau common stock and the subsequent significant declines in the value of Tableau common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

168.    On February 4, 2016, after the market closed, Defendants disclosed less than expected license revenue during the fourth quarter of 2016.  During the quarter, license revenue growth declined by almost 50% sequentially from the third quarter of 2015 and Tableau recorded a $34 million income tax charge due to the Company's acknowledgment that its future income would be insufficient to utilize its deferred tax assets.  When the marketplace was made aware that the foregoing was due to a "competitive dynamic that has become more crowded and difficult," Tableau stock declined by ***nearly 50%***, on very high trading volume.

169.    After these revelations were made public, securities analysts slashed their price targets for the Company's common stock noting "significant deceleration" in the business and concerns about "the specter of increasing competition and potential saturation in Tableau's customer base."

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

170.    Lead Plaintiff is entitled to a presumption of reliance for Defendants' material misrepresentations under the fraud-on-the-market doctrine because the market for Tableau's publicly traded common stock was open, well-developed, and efficient at all times.  As a result of

Defendants' materially false and misleading statements, Tableau's publicly traded common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased or otherwise acquired Tableau's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Tableau and have been damaged thereby.

171.   At all relevant times, the market for Tableau's common stock was an efficient market for the following reasons, among others:

(a)   Tableau's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a public company, Tableau filed periodic public reports with the SEC and/or the NYSE;

(c)   Tableau regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Tableau was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

172.   As a result of the foregoing, the market for Tableau's common stock promptly digested current information regarding Tableau from all publicly available sources and reflected such information in Tableau's common stock price.  Under these circumstances, all purchasers of

Tableau's common stock during the Class Period suffered similar injury through their purchase of Tableau's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

173.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the false statements alleged herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Tableau who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

174.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Tableau's common stock between February 5, 2015 and February 4, 2016, inclusive and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

175.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tableau common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Millions of Tableau common shares were traded publicly during the Class Period on the NYSE.  As of February 23, 2016, there were approximately 54.8 million Tableau common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Tableau or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

177.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

178.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Tableau;

(c)     whether the price of Tableau common shares was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

179.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 10(b) of
### the Exchange Act and Rule l0b-5
### Promulgated Thereunder Against All Defendants

180.    This Count is asserted against the Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

181.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

183.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market price for Tableau's common shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

184.    Each of the Defendants' liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers and/or as a director of the Company, were privy to and participated in the creation, development and reporting of the Company's financial results and prospects; (iii) each of the Individual Defendants was advised of and had access to the Company's management team's internal reports and other data and information at all relevant times; and (iv) each of Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

185.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the truth regarding the Company's business prospects and supporting the artificially inflated prices of Tableau's common shares.  As demonstrated by

Defendants' misstatements of the Company's business and prospects during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

186.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Tableau's common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of Tableau's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Tableau common stock during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

187.    At the time of said misrepresentations and omissions, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Tableau common stock, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

188.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of the Defendants'

wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Tableau common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of
### the Exchange Act Against the Individual Defendants

189.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act.  Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

190.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

191.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as a Class representative and its counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:  February 2, 2018          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                  SAMUEL H. RUDMAN
                                  DAVID A. ROSENFELD
                                  WILLIAM J. GEDDISH


                                       */s/ David A. Rosenfeld*
                                  DAVID A. ROSENFELD

                                  58 South Service Road, Suite 200
                                  Melville, NY  11747
                                  Telephone:  631/367-7100
                                  631/367-1173 (fax)
                                  srudman@rgrdlaw.com
                                  drosenfeld@rgrdlaw.com
                                  wgeddish@rgrdlaw.com

                                  *Lead Counsel for Lead Plaintiff*

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)

*Additional Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on February 2, 2018, I authorized a true and correct copy of the Second Amended Complaint for Violations of the Federal Securities Laws to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD