UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
PLUMBERS AND PIPEFITTERS
NATIONAL PENSION FUND,

Lead Plaintiff,

CARRIE SCHEUFELE, ET AL,

Plaintiffs,

v. 17 CV 5753 (JGK)

TABLEAU SOFTWARE, INC., ET AL,

Defendants. ARGUMENT

------------------------------x

New York, N.Y.
February 8, 2019
11:10 a.m.

Before:

HON. JOHN G. KOELTL,

District Judge

APPEARANCES

ROBBINS GELLER RUDMAN & DOWD
Attorneys for Plaintiffs
BY: DAVID A. ROSENFELD
WILLIAM J. GEDDISH

COOLEY LLP
Attorneys for Defendants
BY: KOJI F. FUKUMURA
KAITLAND M. KENNELLY

(Case called)

MR. ROSENFELD: Good morning, your Honor.

David Rosenfeld from Robbins, Geller, Rudman & Dowd, on behalf of lead plaintiff Plumbers and Pipefitters National Pension Fund.

MR. GEDDISH: William Geddish from Robbins Geller, on behalf of Plumbers and Pipefitters.

MR. FUKUMURA: Good morning, your Honor.

Koji Fukumura, on behalf of the defendants.

MS. KENNELLY: Good morning.

Kaitland Kennelly, on behalf of defendants.

THE COURT: Good morning.

All right. This is a motion to dismiss.

I'll hear some argument.

MR. FUKUMURA: Your Honor, would you like me up there?

THE COURT: That's probably better.

MR. FUKUMURA: Good morning.

THE COURT: Good morning.

MR. FUKUMURA: And I'm going to reserve some time for rebuttal, if I may.

THE COURT: Sure.

MR. FUKUMURA: I want to hit some big thematic issues. I know your Honor has read our papers. I'll, sort of, hit big thematic issues and then save my time on rebuttal to hit any points that the plaintiffs make.

And also, before I forget, we are going to be pressing that the Court dismiss this case with prejudice. This is the second bite at the apple for these plaintiffs; they have filed a consolidated amended complaint, which was really the second complaint they filed.

THE COURT: I think you're getting ahead of yourself.

MR. FUKUMURA: Okay.

So the thing about this motion and what is fundamentally wrong with the plaintiffs' case, I believe it's important to start at the end of the class period on February the 4th, 2016, and look at what the speaking defendants actually said. And I'm starting there because it will inform a lot of the arguments that we're making: *Scienter*, falsity, and loss causation. And it will demonstrate clearly that the plaintiff has not only not pled -- excuse me, has pled this entire case in hindsight, but it will also show that it's pled in hindsight based on a disclosure that didn't even occur, was not even corrective of anything that occurred or that these defendants said during the class period.

I want to be clear, I'm not arguing loss causation up front; I am setting the stage for a discussion about why the allegations failed to plead any of the fundamental requirements of the 10b-5 case under the PSLRA.

So let's talk about what the speaking defendants did not say either in the press release that preceded the February

4th earnings call or during the call itself.

They did not say that, quote, The introduction of new aggressively priced software offerings by Tableau's competitors was causing the company's customers to delay and cancel pending license orders during 2015, the year that had just occurred; or that competitive products were causing during that same time period Tableau's sales cycle to lengthen and its growth rate to decelerate.

Your Honor, these two statements, along with two others, one of them saying the defendants' statements about competition were half-truths, and the last statement, which would be that these speaking defendants didn't believe -- didn't actually hold the opinion about competition, are, in every single -- or after every single so-called misrepresentation, they will have these four statements that I've just read.

And nowhere in the earnings call or in anything pled in this complaint at the end of the class period is there a big reveal that competition, in fact, had caused something to occur in 2015 that rendered the company's statements about its financial condition and offering results during that time period misleading or false.

In fact, what both the speaking defendants, Christian Chabot and Thomas Walker, said during that February 4th call at the end of the class period about competition is as follows --

THE COURT: I'm sorry, is what?

MR. FUKUMURA: Is as follows.

THE COURT: Oh.

MR. FUKUMURA: Thomas Walker, who's the chief financial officer, says, and this is Exhibit 23 to my declaration at page 10 of 21:

With respect to the overall competitive market, right, if you look at the internal data we collect, our win rates are not changing at all actually.

And later on in that same call, Exhibit 23 to my declaration at page 17 of 21, Christian Chabot says:

Over the years, the competitive dynamic has become more crowded and difficult. Tableau and a few other companies have pioneered this new way of visual analytics that I described earlier. And a lot of people have caught notice. And so there are more and more companies with offerings in the area and so it has gotten thicker and thicker over the years, so to speak. But not so much that one jumps out. As Tom mentioned earlier, the opportunities we're engaged with and have data for are, our win rates are actually stable and, in some cases, even higher.

So, again, at no time during this earnings call on February 4, 2016, was there, for loss causation purposes, a revelation of the truth. But for falsity and *scienter* purposes, they have failed to plead that anything that these

defendants said during the class period was materially misleading or false in any way.

And in fact -- and, your Honor, I did hand up a packet of demonstratives. I have also given that to the plaintiffs. And in this first demonstrative is a chart that is largely in our motion to dismiss. I did add a few things and I pointed them out to the plaintiffs. So this shows published guidance for each quarter in the full year and what actually happened.

So according to plaintiffs' theory and the imputation they would like you to extract from their confidential witnesses is that during 2015, as early as the beginning of the class period, this company was, sort of, plagued by canceled orders or elongated sales cycles or an inability to close deals that was materially impacting the company's financial performance during the relevant period, the class period. And those allegations have a number of problems. Of course, in our briefing we've talked about how they are vague and conclusory and nonspecific. And I'll rely on the cases that we've cited. But, from a macro level, I want to talk about the fact that none of that materialized at all.

The company, in the first quarter, published guidance in the range of 110 to $115 million, which was, at the time of that publication, a 54 percent increase year-over-year to the same quarter in 2014, a very healthy growth. And the actual revenue for the first quarter came in $15 million higher than

did the very top end of their range, at #130 million, which ended up being a 75 percent increase year-over-year. So it's certainly not in the first quarter of 2015 that the sky is falling, that stock sales are plummeting. That didn't happen.

How about the second quarter?

The company in the published guidance was in the range of 135 million to 140 million, which is, again, a 54 percent year-over-year increase. What actually happened, the company came in at almost 150 million; $149.9 million, which was a 65 percent increase year-over-year. So it wasn't in the second quarter of 2015 that the sky was falling, that sales were plummeting.

How about the third quarter?

Published guidance in the range of 153 to 157 million. They came in at $170,800,000. Again, 64 percent increase.

And finally in the fourth quarter, they published guidance in the range of 195 to 200 million, and again exceeded the top end of their range of revenue, coming in at 202,800,000.

So in what quarter were these vague and unsubstantiated CW statements impacting? When did sales plummet? When were these elongated sales cycles preventing the company from meeting the guidance it gave to the street?

And let's pause right here and talk about the importance of guidance.

The analysts, when you give them guidance, future projections, that's how they build their models, their discounted cash flow analyses, and try to understand what the future cash flows of the company are going to be so that they can come up with a projected stock price. That is the importance of these models. And in no quarter in 2015 did the company miss guidance; and, in fact, every quarter they exceeded guidance.

The second page of this you'll just see is the full year. The only reason I put this here is because it's illustrative of the fact that every quarter the company refined what it was telling the street: Hey, we can expect more revenue next quarter, so we're going to raise guidance.

And they raised guidance each successive quarter from, in the beginning, in the first quarter of 2015, from 565 million to 580 million, to, in the fourth quarter, 645 million to 650 million. And, of course, they exceeded that as well. And the point there is that this company really tries to keep its analysts, sort of, with its published guidance in the loop.

THE COURT: When I read your brief, I understand that the "resolves exceeding guidance" is part of what you set out as the background facts to the motion to dismiss.

MR. FUKUMURA: Right.

THE COURT: When I get to the portion of the brief in which you argue that the plaintiffs have failed to plead a

false or misleading statement for omission -- and maybe I'm missing it -- I don't see any argument based upon the results exceeded the projections.

MR. FUKUMURA: Your Honor, we've argued that nothing -- they haven't made a false statement.

THE COURT: Yes, but --

MR. FUKUMURA: I'm elaborating on that.

THE COURT: I'm sorry, but --

MR. FUKUMURA: I'm going to go grab my brief.

THE COURT: Sure.

So page 16: Plaintiff fails to plead a false or misleading statement or omission.

Then you set out a series of reasons why the challenged statements are vague and unspecific and not actionable, but puffery, subjective opinion, but not an argument that, as a matter of law, the statements were not false and misleading because the actual results exceeded the guidance provided by the company, which now becomes the centerpiece of the argument on the motion to dismiss.

MR. FUKUMURA: Your Honor, I can pivot right to --

THE COURT: I'm sorry?

MR. FUKUMURA: I can pivot right to why this matters for the arguments.

I believe that we -- and I'm going to find it, that we stated that nothing -- they haven't pled adequately that

anything is false; and that it's sort of part and parcel of, you know, these sort of vague and nonspecific statements that we can't identify. And maybe I'll pivot to that right now.

THE COURT: No, I can tell you, based on the papers and the briefs, what the nature of the argument is. The nature of the argument is that the plaintiffs make -- you say the statements are vague and fail to allege a specific false statement. They say the statements are false and misleading because you persistently talk about the potential for competition, when, in fact, you knew that contracts were being canceled, orders were being canceled, and that competition was, in fact, having problems for the company.

So it was false and misleading to talk about the potential of competition in the context of other companies are getting into this field, as they get into other fields, but we are not presently experiencing the effects of that competition, when, in fact, the orders were being canceled. At least as I read the papers, that was the gist of the dispute between the parties. You say the statements were too vague; they say the statements were false and misleading for failure to talk about the current existence of competition that was hurting the company.

Now, how that impacts the difference between actual results and guidance is difficult for me to determine when I didn't see that argument worked out in the briefs. It

certainly is an interesting argument. And so I went back to the brief to see where that particular argument is spelled out.

MR. FUKUMURA: Your Honor, if I may.

THE COURT: Of course.

If I ask a question, you may answer.

MR. FUKUMURA: So I think it's embedded in, sort of, all the key arguments we're saying, right? So we're saying something -- you're saying this Confidential Witness No. 1 says there were -- the sky is falling in Quarter 1. And we know that the sky is not falling in Quarter 1. As a matter of fact, right -- and that's why the problem with these vague and nonspecific statements is that it's hard to pin exactly what you're talking about in the context of what actually happened.

So to the extent that reference is made to documents that are available to these defendants during any portion of time during the class period, without any specifics about what those documents said. So if they say, You had access to Alpo, right, which is an internal system. Okay. Well, what in that system, at any point in time during 2015, told the speaking defendants that, Hey, there's contemporaneous information that contradicts what you're saying?

There is none. And we know that because if you just look at the results -- and we did, your Honor, put that table of these published results in there --

THE COURT: I think I said that five minutes ago.

MR. FUKUMURA: Right.

THE COURT: I said in the background facts that you put in, that table is put in. Okay. I got that.

I then said -- and I just reviewed the brief again to make sure that my recollection was correct. When I go through the arguments you make with respect to whether the statements were false and misleading, I don't get the other argument that you were making. And again, maybe it's buried somewhere in there. It sure wasn't the centerpiece of the argument, else we wouldn't both be searching the brief for where it appeared or under what topic heading we could possibly fit it in.

MR. FUKUMURA: I will move on.

But I did want to talk about it because I think it just sets the stage for when you look back in why some of the very specific legal arguments we make are so important.

So when we are talking about things being vague and nonspecific, the reason why that's a problem in this case is that it's untethered to, sort of, reality in any way, right. Or if we say, as we did in our papers, none of the seven CWs identified a single document or information or repository that contained specific information contradicting any of the speaking defendants' contemporaneous statements, which is an argument that we've made.

There are multiple problems with that or it's just the pleading defect of not identifying what the specific

contradictory information was in those documents or in those repositories. But just the macro consideration of the fact that in those quarters the company not only wasn't -- this wasn't having a material effect on the company's financial performance, but the company was exceeding its revenue targets for that quarter.

So plaintiff claims that problems were well-known, and says people were not hitting their quarterly goals, again, going to things that we have argued in our papers. When? During which quarter? By how much? Which of the company's 39,000 customers canceled orders? How much revenue was associated with that? What is the magnitude of that? In which sales organizations were any of these confidential witnesses? Were they in the commercial enterprise? International?

There's no detail that would give this Court a basis to say, Geez, you're right. During that quarter, whatever quarter that is, you should have known that things that you were saying to the market were being contradicted by information that you had access to.

In fact, none of the seven --

THE COURT: There's a difference between whether the allegations in the complaint are sufficient factual allegations to proceed and whether the plaintiff will eventually be able to prove that the factual allegations are, in fact, true. It's a motion to dismiss, not a motion for summary judgment.

And you say there is insufficient detail for the plaintiffs to prove that the statements were false. That's not quite the standard on the motion to dismiss. When you begin to talk about proof by the plaintiffs with respect to the allegations, it would be beyond the cases to say that the plaintiffs offer no proof that their allegations are, in fact, correct; therefore, the motion to dismiss is granted.

MR. FUKUMURA: If I said proof, I misspoke, I meant pled. They haven't pled sufficient information in any quarter.

And so just to juxtapose this case against a case that your Honor decided in *Orthofix*, in *Orthofix* we had --

THE COURT: People can cite my cases on both sides, because in some cases motions to dismiss are granted and in some cases they are denied. Take your pick. It depends on what the allegations in the individual case are.

MR. FUKUMURA: Right.

If I may, in *Orthofix* there were very specific detailed CW contact with particular speaking defendants that imbued those speaking defendants with knowledge -- at least for pleading purposes -- of facts that contradicted what they were saying to the public.

Again, when we look at each of the confidential witness statements -- and I'm happy to go through each one of them -- there's not any one statement that identifies with any specificity, if we just look at magnitude, how big were these

customers. When did this occur? At what point during the class period did the sky start falling?

And if you then turn to the facts that are in the case, well, it didn't happen in Quarter 1, it didn't happen in Quarter 2, it didn't happen in Quarter 3 or 4. That's why the facts of the case are important. And they are undisputed. There's never been a restatement in this case. The financial performance of the company is, sort of, set in stone for purposes of this case.

So then we're analyzing, in the context of those facts, whether these vague and nonspecific statements that don't tether a single customer -- so like in *Hi-Crush*, we had a very specific customer who was 18 percent of revenue, who, at least if they had not lost, it was at least very tenuous whether or not that company had lost it. And nevertheless they went and touted that customer among the customers that the company had.

There is nothing like that for any quarter during this class period. And that, I think, is the point that we're trying to make. And that is what is, sort of, fundamental to each of our arguments, is that when you say something like, You violated Reg. SK and Item 303 of Reg. SK, we know under the law in this circuit that the company must actually know of a trend or uncertainty when it files its relevant report; and that the trend or uncertainty must be reasonably likely to have a

material impact on the company's financial statements.

Again, when did the company know? And what we do know is that there was no material impact on the company's financial statements, because the facts that are undisputed in this case is that in every quarter they exceeded their guidance.

And the same thing is true of the Sarbanes-Oxley filings and the filings in the 10-K. Both require the signer -- or a pleading, an allegation, a well-pled allegation that the signer knew that the information was false.

Well, what was false?

And let me pause right here about the question of competition. Because throughout the class period, in each of the company's quarterly reports and in the March period, the company talked extensively about competition.

Kaitland, can I have the exhibits?

The company talks all the time about competition during the class period. And what they do is they talk about it in context. So in all of the filings you'll see, Here are our competitors; they are the biggest companies in the business: Microsoft, Oracle, SAP, Salesforce.

What the plaintiff has selectively done is to selectively pull some language about -- usually at the end of a discussion about a particular competitor like Microsoft or like Salesforce or Qlik, when they say, And we don't see the competitive dynamic changing.

Well, the competitive dynamic with respect to Qlik didn't change, right. So there's no confidential witness that says Qlik was displacing Tableau in ways that were going to materially impact financial statements of the company. No one says that and, as a matter of fact, it didn't happen. Or that Salesforce came in. If you look at the actual statements they come from, they are in context talking about a particular competitor, the biggest of which is Microsoft.

Now, the Power BI product didn't even come out until the middle of the class period. And that's in the exhibits as well, so if you look at the July 29th earnings release. And it just came out.

So what the company said, rightfully, is, Microsoft has been trying for years -- unsuccessfully, by the way -- to compete meaningfully with Tableau in getting the same, sort of, rich, visual, analytical output that our clients enjoy. And we are not seeing any increase in competition there. And the fact is, again, when did that occur?

THE COURT: I think the problem is the argument that you're making and have been making for the last 20 minutes is essentially the plaintiff hasn't alleged false statements because the actual statements that the plaintiff alleges, which the plaintiff alleges were false, were, in fact, true. So the argument is each of those statements was, in fact, true; therefore, they haven't established falsity. They haven't

pled, pleaded, falsity.

The problem with that argument, just in terms of a motion to dismiss, is it's rather stark and hard to say, We win on a motion to dismiss because each of the allegedly false statements was, in fact, true. So our defense is truth. And that's, as arguments go, a fairly stark and not the usual argument, and one which you perhaps were reluctant to make as starkly as I read your papers --

MR. FUKUMURA: I think I --

THE COURT: Now, hold on.

It's one thing to begin talking when I'm done. It's another thing to begin talking while I'm still talking.

And so what you do in your papers is to say they've been insufficiently specific; the statements that they rely on were puffery, they were statements of opinion; and other traditional arguments made in support of a motion to dismiss, rather than, Point 1, what we said was true. Because, phrased that way, the argument, even if right, becomes more like a motion for summary judgment. They allege what we said was false; we say they're wrong. What we said was true.

So just an observation about what I think is a different focus of your argument today from the brief.

And now, yes, I came to an end and it's your turn.

MR. FUKUMURA: I'm going to change my focus right now, your Honor. So I apologize.

What I thought I was trying to say unsuccessfully is that the problem with the lack of specificity at any period of time is that it doesn't give this Court the ability to understand, because it's so vague and nonspecific, how it was misleading in the context of --

THE COURT: But I thought I -- I thought at the early part of the argument I set out my understanding of the differences between the parties, what they say, what you say; and the response to that is, Yes, but what they are saying is just not true.

So they say orders were being canceled; and you say that's just not true. Look at the difference between the actual results and the projections. And you say, Well, that's not specific enough.

Well, that's also a difficult conclusion to reach on a pleading motion. Are contracts being canceled? Are orders being delayed? No, the plaintiff must allege with specificity which contracts and which orders you say.

Okay. Go ahead. I was done with my interjection.

MR. FUKUMURA: To give us some sense of the impact and when it occurred during the year, so it's not just that it doesn't identify -- other than to say in the conclusory fashion that orders were being canceled, that the sales cycles were being elongated, there's nothing that tethers that to any period within this class period.

THE COURT: The class period is just a year, isn't it?

MR. FUKUMURA: Correct. Correct.

And so, again, how does it -- this information that these defendants are alleged to have has to contradict a statement that they are making. And so if the statement is, with respect to Salesforce or Qlik or Microsoft or Amazon, We are not seeing a change in the competitive dynamic -- and those are all very different types of companies -- how does the statement that the competition is increasing render that statement misleading at any particular period of time?

So in February, Christian or Tom may say, with respect to a particular -- in reference to Salesforce, or in reference to Microsoft, We are not seeing a change in the competitive environment. What statement specifically contradicts that? And you can't glean it from these very, sort of, general statements that these confidential witnesses have made.

From the standpoint of *scienter*, none of these confidential witnesses are alleged to have, as in *Orthofix* or in a myriad of other cases, had direct contact with any of these defendants, the speaking defendants, during which they were presented with troubling information, during which someone said, Hey, you know, we're really worried about X or Y or Z. There's none of that. None of these confidential witnesses are alleged to have had that contact, other than to say, generally, that, Well, they had access to internal systems that would have

told them this.

But how does that -- what specifically, within those systems, within any reports generated from those systems, would have led Christian Chabot or Thomas Walker, the speaking defendants, to anything they say would render that misleading?

THE COURT: Could I ask you a question with respect to the issue of motive and opportunity?

MR. FUKUMURA: Yes.

THE COURT: In part you rely on the 10b5-1 plans. When were the 10b-5 trading plans entered into for the individual defendants? I couldn't deduce it from the papers.

MR. FUKUMURA: Well, it's outside the record. It was in November of 2014.

THE COURT: It's not in the record.

MR. FUKUMURA: It's not in the record. It's not in -- the plaintiffs haven't pled it, right. And they have the obligation to plead with specificity. And that's certainly not our biggest argument.

THE COURT: But wait a moment.

A 10b5-1 plan is an affirmative defense against the plaintiffs' allegation of motive and *scienter*.

Plaintiff alleges, Here are huge stock sales.

The response is 10b5-1 plans.

That then places some burden on the party arguing the 10b5-1 plan to say, Why, that's a defense to the huge stock

sales.

And if it's a 10b5-1 sale made during the class period, it's the obligation of the party relying on the 10b5-1 plan to show that, in fact, the 10b5-1 plan is a sufficient answer to the large, unusual stock sale. And the answer to that in this case is it's not, because we don't know when the 10b5-1 plans were entered into.

And even if we did -- and you can help me here -- I just don't understand in this case why the 10b5-1 plan would be a response to the motive and opportunity. Because a defendant who knows that there is a 10b5-1 plan which will provide for a large stock sale during the class period would know that if there were -- it's just the pleading we're talking about -- a scheme to inflate or avoid the deflation of the stock price, a defendant would have a motive because a lot of stock is going to be sold under the plan during the period.

It's not like you can look at a plan that's been in effect forever and say, This shows that these are usual stock sales.

This is a relatively new company that doesn't quite fit with respect to a 10b5-1 sale during the class period. But we don't even have to reach that because we don't know when the 10b5-1 plans were initiated.

Your turn.

MR. FUKUMURA: I don't think you need to even get to

the 10b5-1 plans. Because if you -- and this is from my -- if you look at demonstrative number three, which comes straight out of my declaration, so to use this motive and opportunity, sort of, substitute for the state of mind, it should give this Court some confidence that this trading activity evinces a deceptive scheme or artifice to defraud.

And if you look at the trading for each of the people here, it mirrors in 2014, which we'll call the control period, the term during the class period, almost exactly.

If you look at Christian Chabot, Q1 of 2014, the control period, 300,000; Q2, 150,000.

By the way, if you look at Q1 of '14 and Q1 of '15, it's relatively -- there's a little bit more in 2015. In the second quarter they are largely the same. In the third quarter they are largely the same. And in the fourth quarter they are largely the same.

So the trading during the control period and the trading during the class period are roughly equivalent.

Tom Walker, the same thing. If you look at Q1 of '14 and Q1 of '15, well, he sold a lot more in Q1 of '14. This is the chief financial officer. And overall he sold less during the class period than he did in the control period. So one of the chief perpetrators of this fraud, if you will, sold -- as the plaintiffs allege, that doesn't make any sense.

But if you look at the pattern of trading, is the

pattern of trading so unusual or so suspicious that this Court can say, You know what? That tells me that there's a scheme or artifice to defraud.

And they are going to talk about two cases. And *Freudenberg* is a very important case to look at on the question of 10b5-1 plans and trading. And they've also cited the *Blanford* case. And in both of those cases, there was a significant amount of evidence that at the time the 10b5-1's plans were put in place and at the time of the trading, that these defendants in those cases had actual knowledge of information that contradicted their statements to the public.

Again, it's our --

THE COURT: Isn't one of the problems, just dealing with numbers of shares, the price of the stock went up significantly in 2015, compared to 2014? So if you compare total sales, you don't capture the actual value, the actual amount of money that was made by the sales. I'm just looking at your chart in number three. Is that right?

MR. FUKUMURA: I was waiting for you to finish.

Yes. If you look at the second exhibit, we have that number in there, the actual -- these are gross proceeds, by the way. They are required to, under Second Circuit, law plead profits. We've cited a number of cases to that effect. They haven't done that. But this chart under number two talks about gross proceeds.

And again, the question is in the control period and in the class period, is the trading so unusual -- and the reason why I think demonstrative number three is so important, is because there is a pattern that's followed in the control period and that's replicated in the class period that, pursuant to these 10b5-1 plans during open periods, these defendants sold stock.

And with respect to Thomas Walker, who has a lot less stock, he exercised and sold, so that's demonstrative number four. And it shows that whenever -- each quarter he would exercise and sell a stock. Again, the same pattern during the control period that exists in the class period.

So the question is -- and certainly in -- I'll put this last. They were during -- pursuant to a 10b5-1 plan. And there are no facts, as there are in *Freudenberg* or *Blanford* -- in *Freudenberg* there were 8 out of 16 confidential witnesses testified directly as to the knowledge of the defendants in that case about the mortgage portfolios that they were putting together and the extreme problems with them, their understanding of the extreme problems with them, and their attempts to deceive the public about that.

There's no such well-pled fact in this case at any point, from any confidential witness, saying, I talked to such-and-such, or I was in a meeting with such-and-such, and this happened. There's just nothing.

THE COURT: Okay. Could you finish up?

MR. FUKUMURA: I'm going to reserve the rest of my time for rebuttal.

THE COURT: Okay.

Plaintiff.

MR. ROSENFELD: Thank you, your Honor. And thank you for the accommodation of the time change for this argument.

Your Honor, as we've heard today, this is a securities class action on behalf of purchasers of Tableau stock during a one-year class period, essentially February of 2015 through February of 2016.

Plaintiffs allege that defendants have misrepresented the effect that competition was having on the company. They knew that its competitors had introduced or about to introduce aggressively priced software that directly competed with its own products, and just causing its customers to delay and then, in some instances, later cancel their license orders.

So by the start of the class period, your Honor, defendants were well aware that the company's historical rate of growth, which had been very aggressive, was no longer sustainable and would soon decline.

Analysts were all over this and kept asking about it. They kept asking questions on earnings calls about competition and the effect it was having on Tableau. And defendants kept downplaying any concerns, giving answers such as that they

don't think the competitive environment has changed drastically overall; we haven't really seen the competitive landscape change that materially. We have a chart in the complaint, your Honor, at paragraph 56 showing the stock price and response to many of these statements downplaying competition at different points during the class period.

And at the time the defendants were making these statements, your Honor, we've spoken to numerous former employees who have told us that the defendants were aware or should have been aware or had access to information undermining these very statements. They told us that the sales cycles had lengthened, that the growth rate, the licensing revenue had declined, sales representatives were not meeting their targets.

It's all in our complaint, your Honor. We allege the falsity that we're required to allege. We allege when the statements were made, who made them, why they were false; we allege defendants' *scienter*; and we allege loss causation. And that's all we need to do, your Honor.

Your Honor, they made much today about the falsity of our statements and what our burden is at this stage with regard to the pleading. And the Second Circuit in the *Scholastic* case and the *Novak* case made very clear that our burden is to allege facts to support a reasonable belief that defendants' statements were false or misleading. We do not need to plead evidence, despite what defendants contend.

We believe that we've pled sufficient facts that defendants knew the problems going on with competition, they had accessed information on their claims, as did everyone else at the company. And they knew that by late 2014 and throughout 2015, that they were suffering the effects of competition either now or they were going to in the future because their customers were reacting accordingly.

Your Honor, I would just point out in response to the argument we heard this morning, in paragraph, I think it's 55 of our complaint, we talk about the sales cycle. And the sales cycle can take up to nine months. So it's not like there's a problem in 2015 at some point in time. That quarter is going to immediately affect the earnings.

Our allegation is not about the reported financial results within 2015. If it was, then Mr. Fukumura would be right about his contention that these statements are alleged to be false. But they are not alleged to be false. The statements that we allege to be false concern the company's exposure to competition.

And the company made statements regarding competition. They were constantly being asked about the effects of competition, denied it, even though the information that we have from former employees says it was readily accessible to the company; there were meetings where this was discussed where certain of the individual defendants were present; that there

was the executive vice president of sales who monitored this information daily. So at very of least you have corporate *scienter*, if you want to put aside the other individual defendants.

At the time all this was happening, individual defendants are selling more than $300 million worth of their stock. And defendants raise this issue of a 10b5-1 plan. But as your Honor correctly noted, it is defendants' burden, as it's an affirmative defense. They have not provided any information in the record to show when this plan was entered into. And even if it was entered into in late 2014, one of our CWs says that's when the effects of competition already began to show. So they certainly entered into it, it would appear, at around the same time that they knew the future was looking murky.

THE COURT: Isn't that inconsistent with the argument that you made just a few moments ago, that the actual results compared to the predictive results during the guidance throughout 2015 is really irrelevant because of the length of the sales cycle? You wouldn't expect it to actually appear as the difference in actual versus guidance or projections until later.

MR. ROSENFELD: Your Honor, to be clear, I said we didn't allege that. But if you look, your Honor, on paragraph 40, we have a table there showing the year-over-year change in

annual license revenue, and it shows a steady decline. And this is a company that had dramatic growth in the beginning. It's on page 10 of the complaint, your Honor.

And if you look at that table, you'll see that there's a declining growth in 2014 -- I'm sorry, in 2014 to 2015 and into 2016.

So, yes, it was impacting it, but not at the extend that we're alleging in the later period of 2015. We don't have allegations in our complaint regarding 2014. It doesn't mean it wasn't happening; it just means we don't allege it, your Honor. But in 2016, that's when the company announces that's what's going to be impacted by competition; that's when the dramatic decline happens in the company's revenue growth.

THE COURT: Okay. Go ahead.

MR. ROSENFELD: Your Honor, just going back to this 10b5-1 trading plan for a moment, I also want to point out that there is no charge from the defendants in their response as part of their affirmative defense to show that this plan was not modified at any point during the class period.

Oftentimes, 10b5-1 trading plans are entered into at one point in time, and then there are modifications made throughout a class period. We don't have access to that data because it's not publicly available, your Honor. But as your Honor pointed out before, that's part of defendants' burden, to show that there were no modifications to the 10b5-1 trading

plan, and they have not provided any of that.

So, your Honor, aside from the massive insider sales, which was a 36 percent increase dollar-wise, during the class period than before the class period -- and also, I just want to point out, your Honor, in the *Comscore* case, which is your Honor's case, there was an allegation there regarding massive insider sales. And the defendants came back and said, Well, we had massive sales prior to the class period too. And your Honor held that, Well, whether they are massive during the class period, prior to the class period, or not is irrelevant because they are still massive and unusual in size during the class period on a dollar standing value.

Your Honor, we also allege that defendants had knowledge that they attended meetings where concerns about competition and the impact on sales targets was being discussed. They repeatedly asked about competition on earnings calls. So the fact that they didn't say that we don't know about the effects of competition shows that they did know; and either they were reckless in not finding out, based on the fact that they kept getting being asked about it, or they just misrepresented what was actually being said.

And we certainly allege that they had access to the information contradicting their statements, as we allege that the Alpo software program provided all the information regarding competition. And there were frequent sales meetings

which was attended by the individual defendants during which information regarding competition was being discussed.

Corporate *scienter* we already touched upon, your Honor.

We also have additional allegations of core operations. Two-thirds of the company's revenues came from sales and licensing. So it's pretty much inconceivable that the individual defendants would not be closely monitoring the effects of competition on this.

And, your Honor, looking at the holistic approach to *scienter*, here we have a company -- here we have allegations that defendants knew or had accessed information undermining their statements during the class period regarding competition; and at this time they still owed more than $300 million worth of stock to investors. We think that adequately states a claim.

Your Honor, the last topic I just want to touch on is loss causation.

At the end of the class period, your Honor, the company announced its Q4 2015 results and its results for the full year of 2015.

And they announced two other things:

Number one. That its 2016 revenues were going to decline approximately 25 percent on a year-over-year basis, which is a dramatic decline from prior years.

And it also disclosed that it recognized an income tax expense from the recognition of a deferred tax credit, which essentially means that they were no longer going to have sufficient profits to offset that tax benefit. And because of that, they were writing it off, which led investors to believe that, going forward, profits were going to be negatively impacted.

And on a conference call later that day, Defendant Chabot acknowledged that competition was adversely affecting Tableau's business. And the next day, your Honor, the stock fell nearly 50 percent; pretty much had to sell from a stock of 81.75 a share to 41.33 a share. And analysts who were talking about it mentioned a number of different reasons for the decline. And one of the reasons mentioned was attributing it to a lot of competition.

With regard to some of the other arguments that were raised this morning, your Honor, I would just point out that on that conference call, the quote before regarding from Defendant Chabot about win rates are stable and often higher, that was a comment made talking about stability of revenue. And we're talking about growth, your Honor. And that's what the company is focused on, and that's what the company is revising. Investors are not interested in stable revenues; they want higher revenues. And that's what the company had led us to believe at this point in time, that they were not being

impacted by the competition, when, in fact, they actually were.

With regard to loss causation, I know Mr. Fukumura spoke a little bit about some kind of mirror image disclosure. They need to actually disclose the specifics about what from the competition was hurting them. That is simply not what's required in this circuit, your Honor. There's no requirement for a mirror image disclosure.

And lastly, your Honor -- actually, two more points, your Honor.

Number one, with regard to the former employees now being tethered to the class period, if your Honor looks at our allegations, we specifically talk about pre 2015 and different points within 2015 when the confidential witnesses were telling us what was being discussed and what was known within the company. So there certainly are allegations in the former employees tethering the allegations to the class period.

And lastly, your Honor, with regard to statements that were being asked about competition, a number of the statements do talk about specific competitors. But if your Honor looks at that chart, I think it's paragraph 55, you'll see right there, those are not -- I believe those are examples of different statements that are not tethered to specific competitors, number one.

And number two, to the extent that analysts are asking about specific competitors, but you know as a whole that your

company is being adversely impacted by competitors and by competition, that, your Honor, creates a duty to disclose fully and truthfully the exposure of the company to these risks.

Unless your Honor has any further questions --

THE COURT: No.

MR. ROSENFELD: Thank you, your Honor.

THE COURT: Thank you.

Mr. Fukumura.

MR. FUKUMURA: So with respect to core operations, in each of the cases that they've cited, there was some event that occurred. So in *Hi-Crush*, for instance -- I'll go back to *Hi-Crush*, it's the case they rely on -- there was an event that occurred during the class period, which was the repudiation of a contract by a customer who was 18 percent of revenue. And the repudiation related to -- it was a contractual dispute. But, nevertheless, the company went out after this repudiation and told the investing public, and cited this company, this customer, by name as being a current customer.

And the Court then in *Hi-Crush* said, Well, this is almost 20 percent of your revenue. Of course you're going to know.

There is no event in the class period in this case that one can point to and say, Boy, you knew before this period or you knew before that period X.

THE COURT: Could I --

MR. FUKUMURA: Yes, please.

THE COURT: After the alleged disclosure, the stock drops by 50 percent.

MR. FUKUMURA: Correct.

THE COURT: We know from the cases that a stock drop is insufficient to establish loss causation. On the other hand, it would not be unusual to find in the papers some alternative explanations for a significant stock drop.

In this case, the plaintiff alleges it was the comments about the realization of competition, which is the realization of the allegedly undisclosed facts, that, in fact, caused the stock drop.

Unlike other cases, when I read your papers, other than the argument, which I understand that you can't have a *post hoc ergo propter hoc* fallacy, there is no suggestion, as there soften is, as to what it is that triggered the stock drop. Am I right? Is there something I missed?

MR. FUKUMURA: Oh, no, no.

I think the -- are you done?

THE COURT: Yes.

MR. FUKUMURA: I think the market is reacting to statements that the company made about a softness in spending, and -- not about competition, but a softness in spending in a slowdown in growth. And I think they are reacting to the fact that, for the upcoming year, not for the year that just

happened, for the upcoming year, the company is saying, We're seeing -- this is exactly what they say. It's in Exhibit 23. They don't say a word about competition. They say, Our clients are spending less money; not spending it on anyone else, but spending vertically less money. So this company has what you'd call a land-and-expand model. You go in at $10,000 and you build it up to $100,000 contracts.

THE COURT: But wow, so to speak.

The plaintiff alleges that the company was aware in the year leading up to the 50 percent stock drop of competition that was leading to the cancellation or delay of orders. The company then announces that it sees that its growth is going to be hampered in the coming year because people are not going to be ordering as much from the company. And the company stock drops by 50 percent.

The plaintiff says, You knew that this was coming, because people were canceling orders.

And the defense says, No, we have a slightly different view with respect to competition. It's not that we were aware of the effects of competition in the year leading up to the stock drop; no, it's not that. It's that suddenly, at the end of the class period, we became aware that our customers were going to be spending less in the coming year. And so we announced that and our stock dropped by 50 percent.

And you say, But that's not the effect of competition;

that's the effect of simply our customers purchasing less.

And that can be decided on a motion to dismiss?

Your turn.

When I finish -- it's not hard. When I finish a statement and have a question mark at the end, it invites a response. When I'm in the middle of a sentence, it does not invite a response. So go ahead.

MR. FUKUMURA: So on the question of growth, throughout the class period, Thomas Walker, on multiple occasions, warned the market that growth was going to slow. At Exhibit 17 -- so this is in the middle of the class period in September -- Thomas Walker basically implores the market to heed this warning. I think overall a lesson should be helping manage those expectations. I think that's why guidance is very, very important.

I think the uber comment would be that last year was an enormous year for us, and so the numbers get larger and larger. The revenue rate, the growth rate, is going to come down. In aggregate it's going to go up, meaning revenue. But now we're talking growth rate, it's going to come down. And that's just the law of large numbers. And I think it's very, very important that people understand that and take that to heart.

He says that in September, but he also -- and we've cited this in our papers. He also says that earlier in the

class period and later in the class period. He is constantly warning the market, perhaps in part because their exuberance over their incredible growth rate over 2014 and 2015, to be cautious. So, again, it's undisputed that during the class period Thomas Walker warned about a slowdown in growth.

Now, the question here is whether competitors in win rates for competitors was materially impacting their view of 2016 or whether, as one analyst put it in that February 4th, Exhibit 23, it's the very first question, we're seeing a slowdown in the entire sector, right, and we're seeing, sort of, an economic issue related to a slowdown in spending.

But there is no suggestion in that call on February 4th or in the press release that preceded it that competition was materially impacting this growth rate. It was the fact that we've been growing at, sort of, astronomical levels, quarter over quarter over quarter over quarter. And as the company gets bigger and it gets, now, 39,000 customers and it has 1300 salespeople, it's the law of large numbers. And that's what he says. And I can quote other parts of our papers on that point.

But let's turn back and put this into perspective what these confidential witnesses are actually saying. They are not talking about 2016; they are talking about 2015, that beginning at the very beginning of the class period, they say -- did your Honor have a question?

THE COURT: No, I was actually indicating agreement. I understand that.

The argument is from the plaintiff that, yes, they were talking about what was currently happening, not what would happen. They were talking about allegedly canceled or delayed sales. And so there's the disconnect between the plaintiff and the defense with respect to whether that would necessarily show up in the numbers immediately.

Go ahead.

MR. FUKUMURA: On this point, if you look at page 4 of our opening brief, our motion to dismiss, in February, March, July, these are all before that September quote I read, the CFO of the company cautions in March, I don't think it's reality that Tableau will continue to see accelerated growth, because once an aircraft software company hits 400 million in annual revenue, it decelerates.

July. As the numbers get larger and larger, it becomes harder, from a percentage standpoint, to grow. And then again I read that quote in September, where he's saying, Our growth rate is going to come down at the end of it, which he says, Please listen to me. I think it's very, very important that people understand that and take it to heart. We're going to slow down. Throughout the class period these statements are made.

In the Form 10-K that they filed in February 2015, Its

historical growth rate should not be indicative of its future performance. And we can't provide you any assurance that the business will continue to grow. And so you couple that with statements, It's going to slow down, it's going to slow down, please listen to us, it's going to slow down.

And the problem with these confidential witness statements is that you don't get a sense at all when any of this occurred. And they talk about Kelly Wright and corporate *scienter*. And the requirements for corporate *scienter* are pretty stark. They have to plead facts that she believed her statements were not true; that she had some information to believe that her statements are not true.

And the only thing they say about her was that she was at sales meetings doing her rah-rah speeches, and this confidential witness believed that she would view the sales dashboard at least daily.

Well, what would that sales dashboard show Kelly Wright during any point during this class period? And I won't make reference to how the performance of the company was, but what was it in those that would have caused concern? If she then told Christian Chabot or Thomas Walker about what was in those reports, what in it would have given them concern under the circumstances?

They don't say. They can't quantify it at all, other than to say something bad happened; there was a stock drop; and

let's try to figure out, move backwards, and come up with an explanation for why.

And the reason why this pleading-by-hindsight issue is so important is because there is no specificity. And every single one of the cases that they've cited, there is something around which you can gather some information. There was a restatement.

Okay. When did people know that they were booking revenue incorrectly? Well, there was a meeting where they talked about SAB 101. And someone else came in and that happened to be the CEO.

THE COURT: Could you finish up?

MR. FUKUMURA: Yes.

And on loss causation, your Honor, again, there is nothing in the February 4th conference call or the earnings release that in any way reveals the fraud -- whether a mirror image or otherwise -- about any statements made during the class period, in particular those statements that cautioned the investing public about a deceleration in growth for this company.

THE COURT: Okay. Thank you.

MR. ROSENFELD: Your Honor, if I could just have a minute?

THE COURT: A minute.

MR. ROSENFELD: That's all I'll need.

THE COURT: I'll give the defendant the final word. Go ahead.

MR. ROSENFELD: Okay. Thank you, your Honor.

Your Honor, just quickly, with regard to loss causation, I think paragraph 142 of our complaint, we specifically allege discussion regarding competition on a conference call as one of the factors causing the company to revise its earnings.

With regard to discussion about how long it takes for sales to impact the company, we allege that specifically in our complaint, that there is an up-to-a-nine-month sales process for the numbers to actually impact the company.

Actually, one of our former employees, your Honor, specifically talked about competition from Microsoft; and that product from Microsoft was first being introduced in July of 2015. So certainly we tether it to that point in time and specifically talk about Microsoft, and that product is being introduced then.

THE COURT: Okay.

MR. ROSENFELD: And, your Honor, one last point with regard to the loss causation.

First of all, your Honor, the statements that were being made during the class period certainly undermined what Mr. Walker was saying, and that's the *Freudenberg* case, which talks about if you're making one statement, but it's being

undermined by other statements, then you need to do it with sufficient force to refute what was being said in the other statement. And clearly they did not do that, because if they did, the stock would not have dropped 50 percent when the slowdown in growth happened, which the market should have anticipated based on what we're hearing today.

Thank you, your Honor.

THE COURT: Okay.

Mr. Fukumura.

MR. FUKUMURA: First of all --

THE COURT: If you want. If you want.

I said I would give you the last word or two.

MR. FUKUMURA: He brought up conversations about competition in Exhibit 23. This is the February 4th, 2016. I actually read to you what those say. Please, nothing in there says anything about competition being the factor in their revised -- or their guidance for 2016.

They brought up the fact that there was an analyst, one analyst, that said other than saying that Tableau's product is best in class, it also says -- uses this phrase competition. But as your Honor noted in the *Eaton* case last year, the fact that an analyst says something isn't a substitute for well-pled allegations in a complaint.

And finally about Microsoft. So Microsoft, of course, the biggest competitor in the world, they come out with a

product in July of 2015 when there's literally no detail from any witness when did that start impacting. Doesn't happen right away. Presumably it rolls out. And as it rolls out, there's going to be some impacts.

When did that occur, if at all, during 2015? What are the allegations, the well-pled allegations, that that occurred?

There are none.

So that's it. Thank you.

THE COURT: All right. Thank you.

I'm going to take a ten-minute break.

I'll see you after ten minutes.

(Recess)

THE COURT: All right. I'm prepared to decide.

This is a motion to dismiss the plaintiffs' investor class action lawsuit, alleging violations of Sections 10(b) and 20(a) of the Exchange Act of 1934 and Securities and Exchange Commission SEC Rule 10b-5. The defendants are Tableau Software, Inc. and four of its executives: Christian Chabot, the company's chief executive officer and chairman of the board of directors; Thomas E. Walker, Jr., the chief financial officer; Patrick Hanrahan, the chief scientist and a director; and Christopher Stolte, the chief development officer.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the

plaintiffs' favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191, (2d Cir. 2007). The Court's function on a motion to dismiss is not to weigh the evidence that might be presented at a trial, but merely to determine whether the complaint itself is legally sufficient. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." *Id.* When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit, and that are either in the plaintiff's possession or that the plaintiffs knew of when bringing suit or matters of which judicial notice may be taken. *See Chambers v. Time Warner, Inc*, 282 F.3d 147, 153 (2d Cir. 2002).

Tableau is a software company headquartered in Seattle, Washington, that produces interactive data visualization products focused on business intelligence. (Second amended complaint, paragraphs 26 to 27.) The company generates revenue primarily through licensing, maintenance, and service of its technology. *(Id.* paragraph 28). The lead plaintiff is the Plumbers and Pipefitters National Pension Fund. The plaintiff seeks to represent the class of investors for the period February 5, 2015 to February 4, 2016. *(Id.* paragraph 65 and 139.)

The plaintiffs allege that before the class period began, the defendants developed easy-to-use software products that enabled laypeople to query, analyze, and visualize data more easily. *(Id.* paragraph 32.) The company initially experienced rapid software adoption, faced little competition, and benefited from its pricing power. *(Id.* paragraph 32.)

By the start of the class period, other companies such as Amazon and Microsoft, introduced or were set to introduce software products that directly completed with Tableau's products. *(Id.* paragraphs 33-38.) This rising competition caused some of the company's customers to delay and cancel pending license orders. *(Id.* paragraph 33.) According to a former Tableau employee, "2011, 2012, and 2013 were great years, but... 2014 and 2015 were plagued with salespeople not hitting their quarterly sales goals, which eventually caused

Tableau to lower its sales quotas in January 2016." *(Id.* paragraph 44.)

The plaintiffs allege that the defendants knew that the increased competition was causing the company's customers to delay and cancel pending license orders, but that the company continued to represent falsely that the company's "competitive threats had not changed." (*See, for example, Id.* paragraphs 39-40, 66, 68, 70, 72, 82, 84, 86, 88, 90, 104, 108, 110, 117, 119, 121, 127, 129, 136.)

As proof of the increased competition and the harm it was causing the business, the plaintiffs provide information from seven of the company's former employees. Those employees report that during the class period, the increased competition delayed even "slam dunk" license deals and lengthened sales cycles. *(Id.* paragraph 44.) Many deals were lost to emerging competitors, causing the company's sales cycle to lengthen. *(Id.* paragraph 47); the company's growth slowed because of new or lower-priced competitive product offerings, including those by Microsoft and Amazon, *(Id.* paragraph 48); and that by early 2015, it became very difficult for the company to close license deals due, in part, to the anticipated release of a competitive product from Microsoft. *(Id.* paragraph 52.)

The former employees also stated that the defendants had knowledge of the company's problems stemming from increased competition. For example, the former employees stated that the

problems associated with salespeople not meeting their 2015 sales targets were "well-known" within the company. *(Id.* paragraph 45); that every Tableau employee, including the executives, could access the company's sales data, *(Id.)*; the sales meetings were occasionally attended by defendants Walker and Chabot, *(Id.)*; and the company's executives closely monitored emerging competition in the company's product space. *(Id.* paragraph 47.)

Despite knowing that emerging competition was hurting the company's sales, the defendants continued to make statements suggesting a lack of competition or any problems stemming from such competition. For example, on the day before the start of the class period, February 4, 2015, Defendant Chabot stated that he "did not personally forecast any decline in Tableau's technology deployment trend." *(Id.* paragraph 66.) On the same day, Defendant Chabot stated, "We haven't seen any shifts in the competitive dynamic in the last six months." *(Id.* paragraph 70.)

On February 10, 2015, Defendant Walker said, "I wouldn't think that the overall landscape of competition has changed drastically over the last two years that we've been public." *(Id* paragraph 72.) On March 13, 2015, Defendant Walker stated, "I don't think that environment has changed drastically overall... There is competition. There are people who are working... But from the overall traditional standpoint,

there is not a change in the guard or anything like that." (*Id.* paragraph 86.)

The plaintiffs also allege that there were material misstatements in the company's 2014 Form 10-K, signed by Defendants Hanrahan and Stolte. In that form, the defendants stated, "If our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected, may not grow at all, or may decline"; "If our efforts to upsell to our customers are not successful, our business would suffer"; and "If our sales cycles were to lengthen... events may occur during this period that affect the size or timing of a purchase or even cause cancellations, which may lead to greater unpredictability in our business and results of operations." (*Id.* paragraph 75.) The defendants allege that these disclosures were misstatements because they referred to potential risks rather than existing risks.

On February 4, 2016, the last day of the class period, Tableau reported its financial results for its 2015 fourth quarter and fiscal year ending December 31, 2015. (*Id.* paragraph 139.) The company announced an income tax expense due to recognition of a $46.7 million deferred tax "valuation allowance." (*Id.* paragraph 140.) This made it unlikely that the company would be able to generate future income sufficient to realize its deferred tax assets. (*Id.* paragraph 141.)

Later that day the company held a conference call with

analysts and investors. Defendant Chabot stated on the call that: "Over the years, the competitive dynamic has become more crowded and difficult. Tableau and a few other companies have pioneered this new way of visual analytics that I described earlier. There are more and more companies with offerings in the arena, so it has gotten thicker and thicker over the years, so to speak." *(Id.* paragraph 142.)

Following these announcements, the price of Tableau common stock dropped almost 50 percent, from $81.75 per share on February 4, 2016, to $41.33 per share on February 5, 2016. *(Id.* paragraph 143.)

The plaintiffs allege that during the class period, the individual defendants sold $335 million worth of their personally held shares of stock in the company. *(Id.* paragraph 149.) Defendants Chabot and Stolte sold the equivalent of 13 percent and 27 percent respectively of their pre-class-period Tableau stockholdings. Defendant Walker sold the equivalent of all of his pre-class-period stockholdings, as well as an additional 366,806 shares that he acquired during the class period. *(Id.* paragraph 152.) These sales amounted to $89.3 million for Defendant Chabot, $42.7 million for Defendant Hanrahan, $32.5 million for Defendant Walker, and $170.3 million for Defendant Stolte.

The plaintiffs now bring this suit alleging violations of Section 10(b) and Rule 20(a) of the Exchange Act of 1934 and

SEC Rule 10b-5.

Under Rule 10b-5, it is unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. Section 240.10b-5. To succeed on a Rule 10b-5 claim, the plaintiffs must establish the following elements: "(1) a material misrepresentation or omission; (2) *scienter*, i.e., wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Kleinman v. Elan Corp. plc*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)). In pleading these elements, the complaint must satisfy both Rule 9(b) and the Private Securities Litigation Reform Act, ("PSLRA".) *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

In this case, the defendants challenge only the first, second, and sixth factors.

The defendants argue that the second amended complaint fails to state an actionable misleading statement or omission by the defendants.

In general, there is no duty to disclose a fact "merely because a reasonable investor would very much like to know that fact," *In re Time Warner, Inc. Securities Litigation,*

9 F.3d 259, 267 (2d Cir. 1993), but "disclosure is required... when necessary 'to make... statements made, in light of the circumstances under which they were made, not misleading,'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. Section 240.10b-5(b)). Thus, even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth. *See Caiola v. Citibank N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("The lack of an independent duty is not... a defense to a Rule 10b-5 liability, because upon choosing to speak, one must speak truthfully about material issues.").

Materiality depends on all relevant circumstances, and a complaint normally should not be dismissed based on a lack of materiality "unless the statements or omissions are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162, (2d Cir. 2000) (quoting *Goldman*, 754 F.2d at 1066. "Because the materiality element presents a mixed question of law and fact, it will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund Securities Litigation,* 592 F.3d 347, 360, (2d Cir. 2010).

The defendants argue that the statements alleged to be misrepresentations in the second amended complaint are vague,

fail to establish falsity, and are not actionable. The defendants do not dispute that, if false, the statements alleged to be misrepresentations would be material.

Although the plaintiffs allege a scattershot of false or misleading statements, some of which are not actionable, their core contention is sufficient to plead material misrepresentations, namely, that the defendant made statements throughout the class period that suggested there was no real threat from competition and that the company was not suffering any adverse effects from any competition, when, in reality, increased competition was causing the company to lose expected licenses.

For example, on February 4, 2015, Defendant Chabot stated that "We haven't seen any shift in the competitive dynamic in the last six months." (Second amended complaint, paragraph 70) On February 10, 2015, Defendant Walker said "I wouldn't think that the overall landscape of competition has changed drastically over the last two years that we've been public. *(Id.* paragraph 72.) And on March 3, 2015, Defendant Walker stated "There is competition, there are people who are working... But from an overall traditional standpoint, there is not a change in the guard or anything like that." *(Id.* paragraph 86.)

These statements came at a time when the plaintiffs alleged that rising competition had caused and continued to

cause many of the company's customers to delay and cancel pending license orders, the primary source of the company's income. *(Id.* paragraph 33 and 44.) These allegations are sufficient to plead that the defendants misrepresented the competition and its effect on the company.

The plaintiff also alleges that the defendants made material misstatements in the company's 2014 Form 10-K signed by Defendants Hanrahan and Stolte. That form states "If our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected, may not grow at all, or may decline." And "If our sales cycle were to lengthen, events may occur during this period that affect the size or timing of a purchase or even cause cancellations, which may lead to greater unpredictability in our business and results of operation." *(Id.* paragraph 75.)

By using the qualifiers "if" and "may," the Form 10-K presents these issues as potential problems. But the plaintiffs allege that the company was already experiencing significant setbacks with licensing sales at the time the 10-K was issued. These were current problems, not potential ones, and representing otherwise was untruthful. Therefore, the plaintiffs have sufficiently alleged that the defendants made material misrepresentations of fact.

The defendants claim the plaintiffs have failed to adequately allege *scienter*.

"*Scienter*" in this context means "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). The PSLRA provides that to survive dismissal, the allegations in the complaint must give rise to a "strong inference of *scienter.*" *Id.* at 323. An inference of *scienter* is strong "only if a reasonable person would deem the inference of *scienter* cogent, and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Thus, in analyzing *scienter*, a court looks not just to inferences favoring the plaintiff, but also accounts for "plausible, nonculpable explanations for the defendant's conduct." *Id.*

A plaintiff may show an inference of *scienter* in two ways: "by alleging facts, (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communications, Inc. v. Shaar Funds, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

The plaintiffs have sufficiently pleaded that the defendants had the motive and opportunity to commit fraud. The "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high, while selling their own shares at a profit." *In re Scholastic Corp. Securities Litigation*, 252 F.3d, 63, 74 (2d

Cir. 2001). Stock sales by insiders raises strong inference of *scienter* when those sales are "unusual" because of "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Id.* at 74-75. The timing of the sales is, of course, an important consideration. *See Employees' Retirement System of Government of the Virgin Islands v. Blanford,* 794 F.3d 297, 309 (2d Cir. 2015).

In this case, the plaintiffs allege that during the class period, the individual defendants sold $335 million worth of their personally held shares of stock in the company. (Second amended complaint, paragraph 149.) Defendants Chabot and Stolte sold the equivalent of 13 percent and 27 percent respectively of their pre-class-period Tableau stockholdings; Defendant Walker sold the equivalent of all of his pre-class-period stockholdings, as well as an additional 366,806 shares that he acquired during the class period. *(Id.* paragraph 152.) These sales amounted to $89.3 million for Defendant Chabot, $42.7 million for Defendant Hanrahan, $32.5 million for Defendant Walker, and $170.3 million for Defendant Stolte.

The plaintiffs also allege that the timing of the defendants' class-period trading was unusual, because the vast majority of these sales were within days of the company's positive earnings announcements during the class period. The

plaintiffs further state that the defendants' collective stock sales yielded them proceeds that were 36 percent greater than the preceding one-year period. *(Id.* paragraph 151.)

The defendants assert that their trades were not unusual. The defendants point to the fact that they traded fewer shares of stock during the class period than the preceding year, although they acknowledge that the value of the stock they sold was worth more during the class period.

At the motion to dismiss stage, it is sufficient for the plaintiffs to allege that the value of sales was higher during the class period than the preceding year. *See Scholastic*, 252 F.3d at 74 ("The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares *at a profit*." (citing *Novak v. Kasaks,* 216 F.3d, 300, 307-08 (2d Cir. 2000).

The defendants also argue that the stock sales were not unusual because they were made pursuant to 10b5-1 trading plans. "The existence of a Rule 10b5-1 Trading Plan is an affirmative defense that must be pled and proved." *Freudenberg v. E*Trade Finance Corp.*, 712 F. Supp. 2d 171, 200-01 (S.D.N.Y. 2010); *see also In re EVCI Colleges Holding Corp. Securities Litigation,* 469 F. Supp. 2d 88, 100, (S.D.N.Y. 2006). Indeed, where 10b5-1 trading plans are entered into during the class period, they "provide no defense to *scienter* allegations."

*Blanford*, 794 F.3d at 309; *see also Freudenberg*, 712 F. Supp. 2d at 201 (collecting cases).

The defendants in this case provide copies of their trading plans. However, there is nothing in the record to indicate when the plans were entered into. (See Defendants' Exhibits 27 to 31). The defendants sold more in stock value during the class period than they did during the previous year, but do not explain how their trading plans accomplished that goal. Moreover, Tableau is a young company and the defendants have a short trading history, which frustrates any attempt to evaluate the defendants' historic trading patterns. Therefore, the defendants' trading plans do not provide grounds to dismiss the complaint.

It is noteworthy that the defendants retained a large amount of stock after the class period ended and after the company's stock dropped. However, it is not dispositive that the defendants retained some of their stock, because it is possible that they were attempting to soften their losses without drawing attention to their stock sales. There were plainly substantial stock sales during the class period for a substantial amount of money, stocks sales that could be characterized as unusual.

The plaintiffs have sufficiently alleged motive and opportunity.

The plaintiffs have also alleged strong circumstantial

evidence of conscious misbehavior or recklessness against Defendants Chabot and Walker, but not against Defendants Hanrahan and Stolte.

"The *scienter* element can be satisfied by a strong showing of reckless disregard for the truth." *South Cherry Street, LLC v. Hennessey Group, LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Reckless disregard for the truth "means conscious recklessness, i.e., a state of mind approximating actual intent and not merely a heightened form of negligence." *Id.*

A plaintiff may plead *scienter* by sufficiently alleging that "'the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud,' and hence 'should have known that they were misrepresenting material facts.'" *Id.* (quoting *Novak*, 216 F.3d at 308).

Plaintiffs have satisfied this requirement "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" and "specifically identified the reports or statements containing this information." *Novak*, 216 F.3d at 308-09.

The complaint alleges that former employees stated that every Tableau employee could access the company's sale data, (second amended complaint, paragraph 43); that sales meetings were occasionally attended by Defendants Walker and Chabot, *(Id.* paragraph 45); that problems with salespeople

meeting their 2015 sales targets were discussed at a meeting attended by Defendant Chabot, *(Id.* paragraph 45); that the effects of competition were being closely monitored by the company's management, *(Id.* paragraph 47); that the company closely tracked license deals and the companies that Tableau completed against, *(Id.* paragraph 50); and that "all hands" sales meetings were held once a quarter and were sometimes attended by Defendant Walker, *(Id.* paragraph 53).

The defendants argue that these allegations do not establish *scienter* because they are too vague. As to Defendants Hanrahan and Stolte, the defendants are correct. The plaintiffs do not allege that Defendants Hanrahan or Stolte had actual knowledge of the company's problems relating to sales and rising competition. Moreover, the plaintiffs do not allege that these defendants, who were the chief scientist and chief development officer, had any duty to remain informed about the company's sales or competition. Therefore, the plaintiffs have failed to plead conscious misbehavior or recklessness against Defendants Hanrahan or Stolte.

However, the plaintiffs have alleged conscious misbehavior or recklessness against Defendants Chabot and Walker. The plaintiffs specifically allege that Defendants Chabot and Walker were present at meetings where the company's problems relating to sales and increased competition were discussed. And it is reasonable and plausible that Defendants

Chabot and Walker would be included in such discussions as the company's CEO and CFO.

Because the plaintiffs have "specifically alleged the defendants had knowledge of facts or access to information contradicting the defendants' public statements" about the company's sales and lack of problems relating to competition, *see Novak*, 216 F.3d at 308, 311, they have adequately alleged conscious misbehavior or recklessness against Defendants Chabot and Walker.

The defendants argue that plaintiffs have failed to plead that the alleged misrepresentations and omissions caused the plaintiffs' loss. To allege loss causation under Section 10(b) and Rule 10b-5, the plaintiffs must provide in the complaint "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 347 (2005). To provide the requisite notice, the plaintiffs must plead economic loss and either "that the loss was foreseeable and caused the materialization of the risk concealed by the fraudulent statement," *ATSI*, 493 F.3d at 107, or "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security," *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005); *see also In re New Oriental Education and Technology Group Securities Litigation*, 988 F. Supp. 2d 406,

428 (S.D.N.Y. 2013).

"At the motion to dismiss stage, the complaint need not rule out all competing theories for the drop in... stock price; that is an issue to be determined by the trier of fact on a fully developed record." *Carpenters Pension Trust Fund of St. Louis v. Barclays, PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (quoting *In re Bear Stearns Cos., Inc. Securities, Derivative, and ERISA Litigation*, 763 F. Supp. 2d 423, 507 (S.D.N.Y. 2011)).

The plaintiffs allege that on February 4, 2016, the last day of the class period, the company reported its financial results for its 2015 fourth quarter and fiscal year end. (Second amended complaint, paragraph 139). The company announced that it expected its 2016 first quarter revenue growth rate to decline by approximately 25 percent on a year-over-year basis. The company also announced that it had recognized an income tax expense due to the recognition of a $47.6 million deferred tax "valuation allowance." *(Id.* paragraph 140.) That same day, Defendant Chabot acknowledged that competition for sales was adversely impacting the company.

"Over the years, the competitive dynamic has become more crowded and difficult. Tableau and a few other companies have pioneered this way of visual analytics that I described earlier. And a lot of people caught gotten notice. So there are more and more companies with offerings in the area. So it

has gotten thicker and thicker over the years, so to speak." *(Id.* paragraph 142.)

Following these announcements, the price of the company's common stuck plunged nearly 50 percent, from $81.75 per share on February 4, 2016, to $41.33 per share on February 5, 2016. The plaintiffs allege that these statements which disclose the negative information that had previously been concealed caused the precipitous stock price plunge.

These allegations are sufficient to give the defendants some indication of the loss and the causal connection that the plaintiff has in mind. *Dura Pharmaceuticals, Inc*, 554 U.S. at 347, and are therefore sufficient to allege loss causation.

For the reasons explained above, the defendants' motion to dismiss is denied. The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments were either moot or without merit.

The Clerk of the Court is directed to close docket number 53.

So ordered.

All right. Next step is the scheduling order.

I think it would be most useful if the parties submitted to me a proposed scheduling order by next Friday, after you've had an opportunity for a 26(f) conference.

Plainly, the next step is an answer and a discovery cutoff, as well as anything else you want to provide in the 26(f) report and proposed scheduling order.

I wouldn't think that the time for discovery should be all that long in the case. The parties' positions are relatively clear. I imagine that there will be a dispositive motion at the conclusion of discovery. So one would think that -- well, I don't want to give you a specific date or time, but be reasonable. If you are reasonable in the scheduling order, I will probably agree with it. If I think it is too long, I probably will not.

Anything else for me today?

MR. ROSENFELD: Nothing from plaintiffs, your Honor.

MR. FUKUMURA: The only thing, your Honor, I'm heading to Israel on Tuesday. I'm heading to Israel on Tuesday. I'll be gone until Monday next. I have a case in Israel.

I wonder if you could give us a little more time on the scheduling order?

THE COURT: Yes, sure. No problem.

When do you --

MR. FUKUMURA: Two weeks.

You said next Friday. The Friday after that.

THE COURT: Okay.

MR. FUKUMURA: That would be the 22nd.

THE COURT: Okay.

The parties should submit a proposed scheduling order and a Rule 26(f) report by February 22nd.

You also probably want an extension of time to file answers, right?

MR. FUKUMURA: Yes.

THE COURT: How about March 1, three weeks, to file answers?

MR. FUKUMURA: That's perfect.

THE COURT: Okay.

Time to submit answers extended to March 1.

Okay. Anything else?

MR. FUKUMURA: That's it, your Honor.

THE COURT: Okay.

MR. ROSENFELD: Thank you, your Honor.

MR. FUKUMURA: Thank you, your Honor.

THE COURT: Good afternoon, all.

* * *