UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

CARRIE SCHEUFELE, JEFFREY
SCHEUFELE and NICHOLAS ORAM,
Individually and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,

      vs.

TABLEAU SOFTWARE, INC., CHRISTIAN
CHABOT, THOMAS WALKER, PATRICK
HANRAHAN and CHRISTOPHER STOLTE,

                Defendants.

———————————————————— x

: Civil Action No. 1:17-cv-05753-JGK
:
: CLASS ACTION
:
: MEMORANDUM OF LAW IN SUPPORT
: OF LEAD PLAINTIFF'S MOTION FOR
: CLASS CERTIFICATION
:
:
:
:
:
:
:
:
:

4839-8171-0493.v1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   STATEMENT OF FACTS COMMON TO THE CLASS ..................................................4

III.  THE PROPOSED CLASS SATISFIES RULE 23 ..........................................................5

    A.    The Proposed Class Satisfies Rule 23(a) ........................................................6

        1.    The Class Is so Numerous that Joinder Is Impracticable ............................6

        2.    Common Questions of Law and Fact Exist ..................................................7

        3.    The Proposed Class Representative's Claims Are Typical of Those of the Class ........................................................................................................8

        4.    The Proposed Class Representative Will Fairly and Adequately Protect the Interests of the Class ......................................................................9

    B.    The Proposed Class Satisfies Rule 23(b) ......................................................10

        1.    Common Factual and Legal Issues Predominate ......................................10

            a.    Reliance Is Presumed for All Class Members Under the Fraud-on-the-Market Theory ..........................................................12

                (1)    Tableau's NYSE Listing Is Strong Evidence of Market Efficiency ............................................................12

                (2)    The *Cammer* and *Krogman* Factors Are All Indicative of Market Efficiency ..........................................12

                    (i)    *Cammer* Factor 1: Tableau Common Stock's High Weekly Trading Volume Supports a Finding of Market Efficiency ................................14

                    (ii)    *Cammer* Factor 2: A Sufficient Number of Financial Analysts and Media Covered and Reported on Tableau During the Class Period ......................................................................14

                    (iii)    *Cammer* Factor 3: Numerous Market Makers and Arbitrageurs Support a Finding of Market Efficiency ..............................................15

Page

(iv)     *Cammer* Factor 4: Tableau Was Eligible to
         File Form S-3 Registration Statements
         Throughout the Class Period..................................16

(v)      *Cammer* Factor 5: Tableau's Common Stock
         Reacted to Unexpected Company-Specific
         Information During the Class Period....................17

(vi)     *Krogman* Factor 1: Tableau's Large Market
         Capitalization Supports Market Efficiency............18

(vii)    *Krogman* Factor 2: Tableau's Common
         Stock's Narrow Bid-Ask Spread Supports
         Market Efficiency ..................................................18

(viii)   *Krogman* Factor 3: The High Percentage of
         Market Float Supports Market Efficiency .............18

2.    Reliance Is Presumed for All Class Members Under *Affiliated Ute*..........19

3.    Damages Are Measurable on a Classwide Basis .......................................20

4.    A Class Is Superior to Other Available Methods for Pursuing
      Claims ........................................................................................................21

C.    Robbins Geller Should Be Appointed Class Counsel...........................................23

IV.   CONCLUSION...............................................................................................................24

4839-8171-0493.v1

## CASES

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972)......................................................................................3, 11, 19, 20

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)......................................................................................................10

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...........................................................................................6, 11, 19

*Baffa v. Donaldson*,
   222 F.3d 52 (2d Cir. 2000)............................................................................................9

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..........................................................................................3, 11, 12

*Billhofer v. Flamel Techs., S.A.*,
   281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................12, 15, 18, 22

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................................... *passim*

*Carpenters Pension Tr. Fund v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................... *passim*

*Cent. States Se. & Sw. Areas Health & Welfare Fund v.*
   *Merck-Medco Managed Care, L.L.C.*,
   504 F.3d 229 (2d Cir. 2007)........................................................................................6

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)..................................................................................................20, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)......................................................................................................11

*Fogarazzo v. Lehman Bros.*,
   232 F.R.D. 176 (S.D.N.Y. 2005) ...........................................................................7, 20

*Fogarazzo v. Lehman Bros.*,
   263 F.R.D. 90 (S.D.N.Y. 2009) ..................................................................................6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)................................................................................................11, 12

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
   986 F. Supp. 2d 428 (S.D.N.Y. 2013)....................................................................19

- iii -

Page

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ............................................................................8

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009) .................................................................10

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ............................................................10, 11

*In re JPMorgan Chase & Co. Sec. Litig.*,
    No. 12 Civ. 03852(GBD), 2015 WL 10433433
    (S.D.N.Y. Sept. 29, 2015) ..........................................................6, 7, 12, 21

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 230 (S.D.N.Y. 2015) ..................................................................8

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ....................................................................7

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017) ...................................................................13, 17

*In re SCOR Holding (Switz.) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008) .........................................................22

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16 Civ. 6728(CM)(RWL), 2019 WL 3001084
    (S.D.N.Y. July 10, 2019) ..........................................................................6, 18

*In re Vivendi, S.A., Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ........................................................................17

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ..................................................................6, 8

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .............................................................14, 16

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ..................................................................22

*Katz v. Image Innovations Holdings, Inc.*,
    No. 06 Civ. 3707(JGK), 2010 WL 2926196
    (S.D.N.Y. July 22, 2010) ..................................................................... *passim*

- iv -

**Page**

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ................................................................. *passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................................................... *passim*

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ................................................................................. 21

*Public Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*,
    280 F.R.D 130 (S.D.N.Y. 2012) ............................................................... 23

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ............................................................. 10, 20, 21

*Stoneridge Inv. Partners, LLC v. Sci. Atlanta*,
    552 U.S. 148 (2008) ................................................................................. 11

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016),
    *aff'd, Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ....................................................... 12, 14, 18, 21

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ....................................................................... 20

*Teamsters Local 445 Freight Div. Pension Fund v.*
    *Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008) ................................................................ 13, 17

*Tyson Foods, Inc. v. Bouaphakeo*,
    _U.S._, 136 S. Ct. 1036 (2016) ................................................................. 7

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)
    *cert denied*, _U.S._, 138 S. Ct. 1702 (2018) ....................................... 10, 13

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b) ....................................................................................... 1, 7, 8, 11
    §78t(a) ....................................................................................... 1, 7, 8, 11

4839-8171-0493.v1

**Page**

Federal Rules of Civil Procedure
Rule 23 ..........................................................................................................1, 5, 6, 7
Rule 23(a).............................................................................................. *passim*
Rule 23(a)(1) .........................................................................................................1, 6
Rule 23(a)(2) .........................................................................................................1, 7
Rule 23(a)(4)..............................................................................................................9
Rule 23(b) ....................................................................................................5, 10, 24
Rule 23(b)(3) ........................................................................................ *passim*
Rule 23(g) ..........................................................................................................1, 23
Rule 23(g)(1)............................................................................................................23
Rule 23(g)(1)(A)(i)-(iv) .........................................................................................23
Rule 24(a)(3) .............................................................................................................8

17 C.F.R.
§229.404..................................................................................................................1
§239.13..................................................................................................................16
§240.10b-5.............................................................................................................12

**SECONDARY AUTHORITIES**

*Shelf Registration*, Securities Act Release No. 6499 (Nov. 17, 1983)
1983 WL 408321 ...............................................................................................17

Lead Plaintiff Plumbers and Pipefitters National Pension Fund ("Lead Plaintiff" or the "Fund") respectfully submits this memorandum of law in support of Lead Plaintiff's Motion for Class Certification and requests that, pursuant to Federal Rule of Civil Procedure ("Rule") 23(a) and (b)(3), the Court:   (i) certify this case as a class action; (ii) appoint Lead Plaintiff as Class Representative; and (iii) appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel pursuant to Rule 23(g).

## I.    INTRODUCTION

Lead Plaintiff seeks class certification on behalf of a Class consisting of:

All persons and entities that purchased or otherwise acquired shares of Tableau Software, Inc.'s ("Tableau" or the "Company") Class A common stock between February 5, 2015 and February 4, 2016, inclusive (the "Class Period"), and were damaged thereby.   Excluded from the Class are Defendants, present or former executive officers of Tableau, and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and 1(b)(ii)).

"Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the [Securities] Exchange Act [of 1934] are especially amenable to class certification."   *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707(JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010) (collecting cases) (Koeltl, J.).   "Indeed, courts have acknowledged that '[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally.'"   *Id.*[1]

"Before certifying a class, the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation."   *Id.* at *1.   "The Court must also find that the party qualifies under one of the three sets of criteria set forth in Rule 23(b)(1), (2), or (3)."   *Id.*   Rule 23(b)(3), in particular, permits

---

[1]   All citations and footnotes are omitted and emphasis is added unless otherwise noted.

certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Each of these requirements is readily met.

*First*, the numerosity prerequisite is met because during the Class Period, millions of shares of Tableau common stock traded,[2] and there are likely thousands of Class members who were harmed by Defendants' conduct.[3]

*Second*, the commonality prerequisite is met because this action involves several class-wide issues of law and fact, including whether: (1) Defendants made material misrepresentations and omissions in the Company's Securities and Exchange Commission ("SEC") filings and other public disclosures; (2) Defendants acted with scienter; (3) the price of Tableau's common stock was artificially inflated by Defendants' fraudulent conduct; (4) Class members suffered damages; and (5) the Individual Defendants were control persons of Tableau.

*Third*, the typicality prerequisite is met because Lead Plaintiff's injuries and those of Class members arise from the same alleged fraudulent conduct. Lead Plaintiff and Class members purchased Tableau common stock at prices artificially inflated by Defendants' material misrepresentations and omissions. When the information Defendants fraudulently concealed from

---

[2]   References to Tableau's common stock means Tableau's Class A common stock. Tableau's Class B common stock was not publicly traded. Ex. A, Expert Report of Bjorn I. Steinholt, CFA ("Steinholt Rpt."), ¶5 n.2. All "Ex. __" references are to the Declaration of David A. Rosenfeld in Support of Lead Plaintiff's Motion for Class Certification, filed concurrently herewith.

[3]   "Defendants" are Tableau, together with the "Individual Defendants" – Christian Chabot, Thomas E. Walker, Jr., Patrick Hanrahan and Christopher Stolte.

- 2 -

investors during the Class Period was revealed, the price of Tableau's common stock dropped, injuring Lead Plaintiff and the Class.

**Fourth**, the adequacy requirement is met because Lead Plaintiff has demonstrated that it will vigorously prosecute this case and protect the Class's interests.  No antagonism exists between Lead Plaintiff and the Class.   Additionally, Lead Plaintiff's choice of counsel, Robbins Geller, is experienced in securities class actions and has been appointed by many courts in this Circuit to serve as Class Counsel.

**Fifth**, this action satisfies the predominance requirement of Rule 23(b)(3).  Several issues of fact and law – including falsity, materiality, scienter, loss causation, and damages – are subject to common proof and predominate over any individual issues.  The same is true with the issue of reliance, which may be presumed in this case using either the fraud-on-the-market presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), or the presumption of reliance for omissions under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972).  Indeed, *Basic* permits a presumption of reliance in this case since the market for Tableau common stock, which traded on the New York Stock Exchange ("NYSE"), was efficient throughout the Class Period.  *See* Steinholt Rpt., ¶¶7, 49, 54. And *Affiliated Ute* permits a presumption of reliance since Lead Plaintiff's claims are based, in part, on Defendants' material omissions regarding the negative effect competition was having on Tableau's business.  Common issues will clearly predominate over individual issues in this case.

**Sixth**, the superiority requirement of Rule 23(b)(3) is satisfied because: (1) thousands of geographically-dispersed investors were harmed by Defendants' misconduct; (2) due to litigation costs, it is highly unlikely that investors who lost relatively small amounts of money would file

- 3 -

individual actions; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

Because each requirement for class certification is easily met in this instance, this Court should certify the proposed class.

## II.    STATEMENT OF FACTS COMMON TO THE CLASS

Tableau is a software company that sells software for accessing and visualizing large, complex data sets.  The Company's common stock is traded on the NYSE under the ticker symbol "DATA."  ¶6.[4]  Prior to the Class Period, Tableau capitalized on the burgeoning business analytics market by developing easy-to-use software products that enabled laypeople to query, analyze and visualize data relatively easily.  ¶32.  As a result, Tableau experienced rapid software adoption, enjoyed little competition and benefited from superior pricing power.  *Id.*

But by no later than the start of the Class Period, Defendants knew that large technology companies with significant financial, technical and marketing capabilities – including Amazon and Microsoft – had introduced, or were set to introduce, aggressively-priced software products that directly competed with Tableau's products and were causing Tableau's customers to delay (and later cancel) pending license orders.  ¶¶33-38.  Tableau sales personnel were unable to meet established quotas when license deals slowed due to lower-priced bids by the Company's competitors.  As more and more Tableau customers adopted a wait-and-see approach, sales cycles lengthened and the growth rate of Tableau's licensing revenue during the Class Period decelerated significantly.  ¶¶40, 44, 48-49, 51-52, 54-56.

---

[4]    All "¶_" and "¶¶__" citations are to the Second Amended Complaint for Violations of the Federal Securities Laws, filed February 2, 2018 (ECF No. 45).

As a result, by the start of the Class Period, Defendants knew or recklessly disregarded that the Company's historical rate of growth was unsustainable and would soon decline as competitors seized market share and competition lowered prices. They nevertheless repeatedly misled investors about the true scope and extent of Tableau's competitive landscape, claiming competition was having little, if any, impact on the Company's business and its business outlook. ¶¶39-41, 45, 47, 50, 53, 65-144.

While Defendants were telling investors that they hadn't "seen a change in the competitive landscape," among other things, Tableau insiders were selling substantial portions of their holdings, dumping hundreds of millions of dollars of their personally-held Tableau shares on the unsuspecting public. ¶42. High-level Tableau officers and directors, including the Individual Defendants, sold their personally-held Tableau shares at inflated prices, which yielded them gross proceeds of more than $371 million during the short 12-month Class Period ($335 million of which was sold by the Individual Defendants). ¶¶149, 152.

On February 4, 2016, after the market closed, Defendants disclosed less-than-expected license revenue during the fourth quarter of 2016. ¶168. During the quarter, license revenue growth declined by almost 50% from the third quarter of 2015, and Tableau recorded a $34 million income tax charge due to the Company's acknowledgment that its future income would be insufficient to utilize its deferred tax assets. *Id.* When the market learned that the foregoing was due to a "competitive dynamic that ha[d] become more crowded and difficult," the price of Tableau common stock declined by nearly 50%, on high trading volume. *Id.*

## III.  THE PROPOSED CLASS SATISFIES RULE 23

"To be certified, a putative class must demonstrate that it satisfies all four of the requirements of Rule 23(a) and one of the categories of Rule 23(b) of the Federal Rules of Civil Procedure."

- 5 -

*Carpenters Pension Tr. Fund v. Barclays PLC*, 310 F.R.D. 69, 73 (S.D.N.Y. 2015).  While the analysis under Rule 23 to determine whether a class should be certified is "'rigorous,'" "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  "The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification." *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852(GBD), 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015).  Rule 23(a) requires a numerous class, issues of law or fact common to all class members, and that the class representative is both typical of other class members and adequate to represent them.  Fed. R. Civ. P. 23(a).  All of these requirements are met.

### A.      The Proposed Class Satisfies Rule 23(a)

#### 1.      The Class Is so Numerous that Joinder Is Impracticable

Numerosity requires that the proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007)).  "'In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728(CM)(RWL), 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007)).

Here, the class is so numerous that joinder would be impractical.  Tableau had 49.4 million shares of common stock outstanding as of February 24, 2015, with more than 315 million shares of

Tableau common stock traded throughout the Class Period and more than 600 institutional shareholders. *See* Steinholt Rpt., ¶¶5 n.2, 22, 30. Rule 23's numerosity requirement is easily met. *See Image Innovations*, 2010 WL 2926196, at *3 (1.2 million shares acquired during class period, approximately 25 million shares outstanding, and 412 shareholders of record satisfied numerosity).

### 2.      Common Questions of Law and Fact Exist

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[A] common question is one where 'the same evidence will suffice for each member to make a *prima facie* showing [or] the issue is susceptible to generalized class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, _U.S._, 136 S. Ct. 1036, 1045 (2016). "'Commonality does not mandate that all class members make identical claims and arguments.'" *Image Innovations*, 2010 WL 2926196, at *3. Rather, identifying "'[e]ven a single common legal or factual question will suffice.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009). The commonality requirement, therefore, "has been characterized as a 'low hurdle.'" *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014).

Where, as here, plaintiff alleges injury from similar material misrepresentations and omissions, commonality is satisfied. *Id.*; *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005) (finding the commonality requirement "applied permissively in securities fraud litigation" since, generally, members in the putative class "have been injured by similar material misrepresentations and omissions"); *JPMorgan*, 2015 WL 10433433, at *3 (commonality requirement met where plaintiffs alleged that "all members of the Proposed Class were injured by the same misstatements").

Common questions of law and fact in this case likewise include, *inter alia,* whether: (1) Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"); (2) Defendants publicly misrepresented material facts or omitted material facts they were required to disclose; (3) Defendants knowingly or recklessly disregarded that the alleged misstatements and omissions were false and/or misleading; (4) the price of Tableau common stock was artificially inflated as a result of Defendants' alleged misconduct; and (5) the Class suffered damages when the artificial inflation of Tableau's common stock price dissipated upon revelation of the truth.  This is sufficient to satisfy the commonality requirement.  *Image Innovations*, 2010 WL 2926196, at *3.

### 3.  The Proposed Class Representative's Claims Are Typical of Those of the Class

Typicality requires that the claims of the class representative be typical of those of the class. Fed. R. Civ. P. 24(a)(3).  To satisfy this requirement, the party seeking certification must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  Particularly in securities fraud cases such as this one, where plaintiff "seek[s] to develop facts relating to . . . the dissemination of allegedly false or misleading statements," *Vivendi*, 242 F.R.D. at 85, this requirement is "'not demanding'" to satisfy. *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015).

Here, Lead Plaintiff alleges (for itself and on behalf of the Class) that Defendants violated §§10(b) and 20(a) of the Exchange Act by making public statements that misrepresented or omitted material facts and artificially inflated the price of Tableau's common stock. *See, e.g.*, ¶¶65-144. Lead Plaintiff's claims are typical of other Class members.

### 4. The Proposed Class Representative Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This requirement consists of two elements: (1) the qualification, experience and ability of the plaintiffs' attorneys; and (2) the absence of any substantial antagonism between the named plaintiffs and the class members." *Image Innovations*, 2010 WL 2926196, at *4.

Both elements are easily met. Lead Plaintiff has engaged competent Lead Counsel that is "qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson*, 222 F.3d 52, 60 (2d Cir. 2000). Robbins Geller has extensive experience litigating securities class actions in courts throughout the country, including this one, having successfully prosecuted hundreds of securities class actions on behalf of injured investors. *See* ECF No. 17-4; *see also Carpenters*, 310 F.R.D. at 100 ("Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."). Lead Counsel is qualified, experienced and able to prosecute this action.

There is also no antagonism between Lead Plaintiff and Class members. As demonstrated above, Lead Plaintiff's claims parallel those of Class members. *See, supra,* §§III.A.2-3; *Imagine Innovations*, 2010 WL 2926196, at *4 (adequacy demonstrated where "named plaintiffs possess the same interest and suffered the same injury as the class members" and "in light of the strong presence of commonality and typicality in this case").

In addition, Lead Plaintiff has demonstrated its willingness and ability to serve as Class Representative. It moved for and was appointed Lead Plaintiff, has supervised and monitored the progress of this case, successfully opposed – through counsel – Defendants' motion to dismiss, responded to and propounded discovery and it will make itself available for depositions, hearings

and trial.  Indeed, Lead Plaintiff has successfully served as a class representative in multiple other securities class actions.  *See, e.g.*, ECF No. 17-2 at 2.[5]  By appointing the Fund as Lead Plaintiff, this Court has already made a preliminary determination as to its adequacy.  *See In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 275 (N.D. Ala. 2009).  The Class's interests are protected.

### B.      The Proposed Class Satisfies Rule 23(b)

The proposed Class also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997).  "'Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'"  *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)), *cert denied*, _U.S._, 138 S. Ct. 1702 (2018).  "'Predominance is a test readily met in certain cases alleging consumer or securities fraud," as here.  *Image Innovations*, 2010 WL 2926196, at *5 (citing *Amchem*, 521 U.S. at 625).

### 1.      Common Factual and Legal Issues Predominate

Under Rule 23(b)(3), predominance exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  This standard "'does not require a plaintiff to show that there are no individual issues.'"  *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 236 (S.D.N.Y. 2012).  Rather, "[c]ommon issues of law and fact

---

[5]     Page numbers in citations to docket entries ("ECF") refer to the page numbers generated by the electronic case management (CM/ECF) system.

4839-8171-0493.v1

generally predominate in actions, as here, alleging that materially false representations were made to large groups of investors." *Image Innovations*, 2010 WL 2926196, at \*5; *IndyMac*, 286 F.R.D. at 236 (when "issues of liability are 'common to the class, common questions are held to predominate over individual questions'").

Under §10(b), plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci. Atlanta*, 552 U.S. 148, 157 (2008).[6] The Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity and materiality elements) and whether the revelation(s) of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, the loss causation element) are each common questions of law and fact that predominate over individualized ones. *See Amgen*, 568 U.S. at 467-68, 474-75 (falsity and materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (loss causation).

With respect to the element of reliance, the predominance requirement is met in a securities fraud class action where, as here, plaintiffs are entitled to rely on either of two established presumptions: (1) the fraud-on-the-market ("FOTM") presumption of reliance, *Basic*, 485 U.S. at 241; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263, 268 (2014) ("*Halliburton II*"), or (2) the *Affiliated Ute* presumption of reliance for claims based on omissions. 406 U.S. at 153-54. As discussed below, both presumptions negate any concern that individualized questions of reliance might predominate in this action.

---

[6]  Lead Plaintiff's §20(a) claims are derivative of the §10(b) claims.

### a.  Reliance Is Presumed for All Class Members Under the Fraud-on-the-Market Theory

The FOTM theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).  In a well-developed or efficient market, whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268.  The Class is entitled to the FOTM presumption because Tableau's common stock traded in a well-developed and efficient market throughout the Class Period.

### (1)  Tableau's NYSE Listing Is Strong Evidence of Market Efficiency

Tableau's common stock traded on the NYSE during the Class Period.  For many courts, this alone supports a presumption of efficiency.  *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (stating that a security listed on NASDAQ, American Stock Exchange or NYSE is presumed efficient at class certification stage); *Carpenters*, 310 F.R.D. at 81 (collecting cases noting that some courts presume securities traded on national markets to be efficient and most courts agree that NYSE listing "is a good indicator of efficiency").  At a minimum, that Tableau's shares traded on a national exchange provides "a strong indication" of market efficiency. *JPMorgan*, 2015 WL 10433433, at *6; *accord Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that such listing is a good indicator of efficiency"), *aff'd, Waggoner*, 875 F.3d at 79.  *See also* Steinholt Rpt., ¶¶19-20.

### (2)  The *Cammer* and *Krogman* Factors Are All Indicative of Market Efficiency

To establish that the market for Tableau's common stock was efficient, courts also consider the following factors, commonly referred to as the *Cammer* factors:

"(1) [A] large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of stock price caused by unexpected corporate events or financial releases."

*McIntire*, 38 F. Supp. 3d at 431 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

The *Cammer* factors are meant to be a non-exhaustive list of relevant factors, none of which is dispositive to determining market efficiency. *See Carpenters*, 310 F.R.D. at 83 ("The Second Circuit has not adopted a specific test for market efficiency and explicitly declined to do so in *Bombardier*. While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive."). Nevertheless, "[t]he vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than as a checklist.'" *Id*.[7]

In assessing market efficiency, courts within the Second Circuit also frequently utilize the *Krogman* factors, which analyze: "(1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the

---

[7]    The Second Circuit has rejected undue emphasis on the fifth *Cammer* factor – a factor said to provide a "'direct' measure of [market] efficiency." *Waggoner*, 875 F.3d at 89, 97-98; *accord In re Petrobras Sec. Litig.*, 862 F.3d 250, 277-78 (2d Cir. 2017). Indeed, "[d]irect evidence . . . may be more critical . . . in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market." *Waggoner*, 875 F.3d at 98. But that is not the case here, where each of the *Cammer* and *Krogman* factors supports a finding of market efficiency for Tableau common stock during the Class Period.

security are held by the public, rather than insiders." *McIntire*, 38 F. Supp. 3d at 431 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)).

In support of its Motion, Lead Plaintiff submits the Steinholt Report to prove that Tableau common stock traded in an efficient market during the Class Period. Mr. Steinholt has extensive experience analyzing market efficiency in securities class actions such as this. Steinholt Rpt., ¶¶1-3. As explained below, Mr. Steinholt concludes that Tableau common stock satisfies all of the *Cammer* and *Krogman* factors. Steinholt Rpt., ¶¶21-49.

> **(i)**      ***Cammer* Factor 1: Tableau Common Stock's High Weekly Trading Volume Supports a Finding of Market Efficiency**

High trading volume "'implies significant investor interest in the company . . . [and], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Strougo*, 312 F.R.D. at 316. "Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (quoting *Cammer*, 711 F. Supp. at 1286).

Tableau common stock's weekly average trading volume of over 11% of outstanding shares during the Class Period thus merits a strong presumption of market efficiency. Steinholt Rpt., ¶23. Indeed, there was significant investor interest in Tableau during the Class Period, where, on average, six million shares of the Company's common stock traded weekly. *Id*.

> **(ii)**      ***Cammer* Factor 2: A Sufficient Number of Financial Analysts and Media Covered and Reported on Tableau During the Class Period**

Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D.

at 446.  "This factor is commonly met where multiple large brokerage firms produce . . . reports on the financial condition of a company . . . ."  *McIntire*, 38 F. Supp. 3d at 431.

Here, approximately 26 firms followed Tableau during the Class Period, issuing at least 180 analyst reports during that time.  Steinholt Rpt., ¶25.  Tableau's analyst coverage easily satisfies this *Cammer* factor and supports a finding that the market for Tableau's common stock was efficient during the Class Period.  *See McIntire*, 38 F. Supp. 3d at 431 (finding market efficiency even though no analysts covered the defendant corporation during the first three months of the class period, and the company was only covered by two analysts for the remainder of the class period).

Courts have also held that widespread media coverage supports a finding of efficiency.  *See Carpenters*, 310 F.R.D. at 92 (stating that the regular issuance of press releases, press coverage and dissemination of information through news services such as *Bloomberg* were factors that supported finding of market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (noting the publication of over two dozen press releases and articles supported finding of efficiency).  Here, over 800 media reports about Tableau were published during the Class Period in public news sources.  Steinholt Rpt., ¶26.  Tableau's extensive media coverage provides further support for the efficiency of the market for Tableau's common stock.  *Id.*, ¶27.

> **(iii)**     ***Cammer* Factor 3: Numerous Market Makers and Arbitrageurs Support a Finding of Market Efficiency**

The third *Cammer* factor, the number of market makers and arbitrageurs, is additional evidence of market efficiency for Tableau common stock.  "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the

market-clearing level." *Winstar*, 290 F.R.D. at 446.[8]  Here, there were more than 100 supplemental liquidity providers for Tableau's common stock during the Class Period – more than enough to support a finding of efficiency.  Steinholt Rpt., ¶29 n.33; s*ee Winstar*, 290 F.R.D. at 446 (six market markers evidenced market efficiency); *Carpenters*, 310 F.R.D. at 92 (holding 51 market makers sufficient and noting that courts in the Second Circuit had found as few as six market makers adequate to support a finding of efficiency).  Additionally, more than 600 institutional investors were invested in Tableau's common stock during each quarter of the Class Period.  Steinholt Rpt., ¶30.  The multitude of institutional investors transacting in Tableau common stock is further evidence of market efficiency.  *Id*.

> **(iv)** **  *Cammer* Factor 4: Tableau Was Eligible**
> **     to File Form S-3 Registration Statements**
> **     Throughout the Class Period**

"The ability to file this form indicates that the company is easily able to issue new securities," and is evidence of market efficiency.  *Winstar*, 290 F.R.D. at 447.  A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 consecutive months and possesses a market capitalization of at least $75 million.  *See* 17 C.F.R. §239.13.  The ability to file a Form S-3 "recognize[s] the applicability of the efficient market theory to [eligible filers]," "whose corporate information" is "constantly digested and synthesized by financial analysts" and "broadly disseminated on a timely basis by the financial press and other participants in the marketplace."  Ex.

---

[8] NYSE does not have market makers as the term was used in *Cammer*.  Steinholt Rpt., ¶29.  Instead, trades are made through a "designated market maker" responsible for maintaining a fair, orderly and efficient market for each security.  *Id*.  Additionally, in 2005, SEC regulations enabled trading of NYSE-listed stocks on other exchanges that do have market makers, such as NASDAQ.  *Id*. at n.33.

B at *5, *Shelf Registration*, Securities Act Release No. 6499, 1983 WL 408321 (Nov. 17, 1983);
*accord Cammer*, 711 F. Supp. at 1284.  Tableau was eligible to file Form S-3 registration statements
at all times during the Class Period.  Steinholt Rpt., ¶32.  This factor supports efficiency.

> **(v)**      ***Cammer* Factor 5: Tableau's Common
> Stock Reacted to Unexpected Company-
> Specific Information During the Class
> Period**

The last *Cammer* factor focuses on whether Lead Plaintiff can make a *prima facie* showing
that, during the Class Period, the price of Tableau's common stock quickly responded to the release
of new and "unexpected" Company-specific information.  *Cammer*, 711 F. Supp. at 1287.  To
demonstrate this factor, Mr. Steinholt conducted an event study for Tableau's common stock.
Steinholt Rpt., ¶¶34-41.  "'[A]n event study that correlates the disclosures of unanticipated, material
information about a security with corresponding fluctuations in price has been considered *prima
facie* evidence of the existence of such a causal relationship.'"  *Petrobras*, 862 F.3d at 278  (quoting
*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir.
2008)).  The Second Circuit has recognized that event studies are "'standard operating procedure in
federal securities litigation.'"  *In re Vivendi, S.A., Sec. Litig.,* 838 F.3d 223, 253 (2d Cir. 2016).

Mr. Steinholt's event study tested the causal relationship between the announcement of
Tableau-specific news and a response in the price of Tableau's common stock.  Steinholt Rpt., ¶35.
The statistical analysis Mr. Steinholt conducted determined how much of that price response can be
explained by market and peer group factors rather than Company-specific information.  *Id.*, ¶¶34-35.
Based on his event study, Mr. Steinholt determined that there was a cause-and-effect relationship
between new, material Tableau-related information and changes in the price of Tableau common
stock, evidencing that Tableau common stock traded in an efficient market during the Class Period.
*Id.*, ¶¶35-42.

      (vi)       ***Krogman*** **Factor 1: Tableau's Large**
                        **Market Capitalization Supports Market**
                        **Efficiency**

Market capitalization is an indicator of market efficiency because "investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency." *Strougo*, 312 F.R.D. at 315. During the Class Period, Tableau had a market capitalization for its Class A shares that exceeded $3.8 billion at all times. Steinholt Rpt., ¶44. Tableau's market capitalization thus exceeded the market capitalizations of securities found to be trading in efficient markets. *See, e.g.*, *Billhofer*, 281 F.R.D. at 154 ($288 million to $717 million market capitalization); *McIntire*, 38 F. Supp. 3d at 433 ($292 million to $585 million market capitalization).

      (vii)     ***Krogman*** **Factor 2: Tableau's Common**
                        **Stock's Narrow Bid-Ask Spread Supports**
                        **Market Efficiency**

The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares. *See Krogman*, 202 F.R.D. at 478. "[A] small bid-ask spread indicate[s] that trading in the stock [is] inexpensive, suggesting efficiency." *Strougo*, 312 F.R.D. at 316. Tableau's common stock had a bid-ask spread during the Class Period averaging 0.03%. Steinholt Rpt., ¶46. This is well within what courts have found indicative of market efficiency. *Signet Jewelers*, 2019 WL 3001084, at *12 (also noting that "the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%).

      (viii)    ***Krogman*** **Factor 3: The High Percentage**
                        **of Market Float Supports Market**
                        **Efficiency**

A stock's "float" is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities. A higher float indicates greater market efficiency. *See Krogman*, 202 F.R.D. at 478; *Strougo*, 312 F.R.D. at 316-17 (finding that "[t]he percentage of shares available to

the public generally bears a direct relationship to efficiency" because when insiders with private information hold large portions of the security, "the price is less likely to reflect only the total of all public information"). During the Class Period, the average float of Tableau's common stock was approximately 99%. *See* Steinholt Rpt., ¶48. Tableau's high public float supports a finding of market efficiency. *See McIntire*, 38 F. Supp. 3d at 433 (insider ownership of 57% to 69% of shares outstanding supported a finding of market efficiency).

In sum, all of the *Cammer* and *Krogman* factors evidence that the market for Tableau's common stock was efficient during the Class Period. Steinholt Rpt., ¶49. Thus, the Class is entitled to a classwide presumption of reliance.

### 2.    Reliance Is Presumed for All Class Members Under *Affiliated Ute*

Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id*. at 153-54. The *Affiliated Ute* presumption reflects the reality that where no positive statements exist "'reliance as a practical matter is impossible to prove.'" *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013). Furthermore, because materiality itself is a common question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 466.

Lead Plaintiff alleges numerous material omissions during the Class Period. First, Tableau's Forms 10-K and 10-Q failed to disclose known trends or uncertainties, as required under Item 303 of Regulation S-K, concerning competitive offerings that had, or were reasonably likely to have, a material impact on the Company's revenues or income. *See, e.g.*, ¶¶57-60, 76, 79, 96, 99. Second,

- 19 -

Tableau's Forms 10-K and 10-Q failed to disclose risk factors, as required under Item 503 of Regulation S-K, concerning then existing risks Tableau faced from competitors. *See, e.g.*, ¶¶61-62, 75, 95, 99. Third, Defendants' statements were false and misleading when made because they failed to disclose that new, aggressively-priced products offered by competitors were causing Tableau's customers to delay or cancel orders. For example, Defendants repeatedly made statements regarding Tableau's growth and growth potential without mentioning the onset of the new competition and its negative effect on the Company's sales and growth rate. *See, e.g.*, ¶¶66-67, 80-81, 86-87, 92-93, 100-107, 125-126.

Under these circumstances, a showing of reliance on the omissions is unnecessary, even if Lead Plaintiff also alleges that Tableau disseminated affirmative misstatements. *See Fogarazzo*, 232 F.R.D. at 186 ("[T]he theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information.").

### 3.      Damages Are Measurable on a Classwide Basis

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407. Accordingly, and as the Second Circuit has acknowledged, *Comcast* does not require "a finding that damages are capable of measurement on a classwide basis." *Id.* at 402. "All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).

Here, Lead Plaintiff has made the necessary connection and demonstrated that damages can be calculated using a common methodology. In fact, by using a universally accepted event study,

Mr. Steinholt explains that alleged fraud-related price inflation can be quantified and used to calculate per-share damages based on Class members' purchase and sale dates.  Steinholt Rpt., ¶¶51-52.  Per-share damages will be calculated using this same methodology for all Class members and is flexible enough to account for information that may be revealed through the discovery process. Steinholt Rpt., ¶¶52-53.  Courts have consistently found that this approach satisfies *Comcast*.  *See Strougo*, 312 F.R.D. at 327 ("Plaintiffs intend to use an event study and the constant dollar method to calculate damages.  The proposed methodology fits their theory of the case and individualized damages issues will not predominate."); *JPMorgan*, 2015 WL 10433433, at *7 (*Comcast* satisfied where "[p]laintiffs' expert proposes to calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or omissions"); *Carpenters*, 310 F.R.D. at 99 ("Plaintiffs' model survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3) – their theory of  liability matches their theory of damages and individualized damages issues will not predominate.").

Moreover, although the specific amount of damages may vary among Class members, it is well established that "'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)."  *Roach*, 778 F.3d at 405 (collecting cases).

### 4.    A Class Is Superior to Other Available Methods for Pursuing Claims

"[A]s a general rule, securities fraud cases 'easily satisfy the superiority requirement [because] [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.'"  *Image Innovations*, 2010 WL 2926196, at *6; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (noting that in the case before it "most of the

plaintiffs would have no realistic day in court if a class action were not available"). This case is no different. The proposed Class consists of "dozens if not more potential claimants who are asserting claims based on predominantly common issues" and "[a]djudicating individual claims would be a significant waste of judicial resources." *Billhofer*, 281 F.R.D. at 164.

Under Rule 23(b)(3), consideration of the following factors determines whether the "superiority" requirement is met: (1) the Class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against Class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Each factor weighs in favor of class certification here.

First, the Class consists of a large number of purchasers whose individual damages likely are too small to make individual litigation economically worthwhile. The superiority requirement is met where, like here, there is a "risk that, absent class action, certain . . . investors would be unable to adjudicate their claims." *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015). Second, Lead Plaintiff is not aware of any other securities fraud litigation commenced by any Class member regarding the alleged fraud. Third, resolving the claims class-wide in this District ensures an efficient expenditure of resources because individual Class members are geographically dispersed, and concentrating litigation in this Court eliminates the risk of inconsistent adjudication. *See In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources," and "[f]orcing each investor to litigate separately would also risk disparate results among those seeking redress."). Fourth, Lead Plaintiff does not foresee any management difficulties that will preclude this case from being maintained as a class action.

- 22 -

Allowing this case to proceed as a class action would also eliminate "the risk of inconsistent judgments" and conserve judicial resources, while enabling the Class to benefit from "the familiarity of the Southern District of New York with securities law." *Public Emps. Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc.*, 280 F.R.D 130, 141 (S.D.N.Y. 2012).

### C.    Robbins Geller Should Be Appointed Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Lead Plaintiff respectfully requests that the Court appoint Robbins Geller as Class Counsel. In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law" and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). As mentioned previously, Lead Counsel is well-qualified to prosecute this case on behalf of Lead Plaintiff and the other members of the Class, and has already undertaken a vigorous prosecution of this action, including conducting an extensive investigation of the claims, defeating Defendants' motion to dismiss, engaging in discovery, and pursuing class certification. Accordingly, Robbins Geller fulfills the requirements of Rule 23(g). The Court should appoint the firm as Class Counsel.

## IV.    CONCLUSION

The proposed Class satisfies the requirements of Rules 23(a) and (b), and Lead Plaintiff and

Robbins Geller will vigorously advocate for all Class members.  Lead Plaintiff's Motion for Class

Certification should be granted in full.

DATED:  August 1, 2019                    Respectfully submitted,

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         WILLIAM J. GEDDISH


                                                s/ DAVID A. ROSENFELD
                                         ─────────────────────────────────
                                               DAVID A. ROSENFELD

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         drosenfeld@rgrdlaw.com
                                         wgeddish@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         DOUGLAS R. BRITTON (*pro hac vice*)
                                         SUSANNAH R. CONN (*pro hac vice*)
                                         KEVIN A. LAVELLE (*pro hac vice*)
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         dougb@rgrdlaw.com
                                         sconn@rgrdlaw.com
                                         klavelle@rgrdlaw.com

                                         Lead Counsel for Lead Plaintiff

- 24 -

LABATON SUCHAROW LLP
JONATHAN GARDNER
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jgardner@labaton.com

O'DONOGHUE & O'DONOGHUE LLP
LOUIS P. MALONE
5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC  20015
Telephone:  202/362-0041
202/362-2640 (fax)
lmalone@odonoghuelaw.com

Additional Counsel for Lead Plaintiff

- 25 -

## CERTIFICATE OF COMPLIANCE

Pursuant to the Individual Practices of Judge John G. Koeltl, dated October 31, 2018, the

undersigned certifies that the Memorandum of Law in Support of Lead Plaintiff's Motion for Class

Certification complies with all formatting rules and contains 6917 words, excluding the cover page,

this certification of compliance, table of contents, table of authorities, and counsels' signature

blocks.


s/ DAVID A. ROSENFELD
DAVID A. ROSENFELD

4839-8171-0493.v1

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on August 1, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.  I further certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 1, 2019 at Melville, New York.

    s/ DAVID A. ROSENFELD
      DAVID A. ROSENFELD

- 1 -